Mary D. TIPTON, Plaintiff–Appellant,

v.

CANADIAN IMPERIAL BANK OF COMMERCE, Defendant–Appellee.

No. 87–8798.

United States Court of Appeals,
Eleventh Circuit.

May 17, 1989.

James W. Howard, Howard, Secret & Wilde, P.A., Atlanta, Ga., for plaintiff-appellant.

W. Lyman Dillon, Hansell & Post, Atlanta, Ga., for defendant-appellee.

Before CLARK and HATCHETT, Circuit Judges, and FITZPATRICK *, District Judge.

FITZPATRICK, District Judge.

Mary Tipton brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e–2(a)(1) and 2000e–3(a), and various provisions of State law alleging sex discrimination and retaliatory discharge, breach of contract, interference with a contractual relationship, and fraudulent and deceptive conduct on the part of

Defendant Canadian Imperial Bank of Commerce (CIBC) both before and during the employment relationship. The district court granted summary judgment in favor of CIBC on all of Tipton's claims except those alleging disparate treatment and retaliatory discharge. Following a non-jury trial, the district court entered its findings of fact and conclusions of law ruling in favor of CIBC on the remaining claims. After considering the issues raised on appeal, we affirm.

## I. FACTS

CIBC is a Canadian corporation and banking institution which conducts business in the United States, including the State of Georgia. In August of 1983, a managerial position became open in CIBC's Atlanta office. Paul Cropley, then Senior Manager of CIBC's Atlanta office, was responsible for filling the position. Cropley screened several applicants and eventually interviewed Tipton, who had been approved and referred to Cropley by CIBC's New York office. Following the interview, CIBC's Personnel Manager sent Tipton a letter offering her the position and setting forth certain terms of the employment. On April 7, 1984, Tipton accepted the offer and returned the letter to the Personnel Manager. Thereafter, on May 1, 1984, Tipton began her employment with CIBC as Manager, Corporate Banking, in the Atlanta office.

Tipton was the first female manager employed by CIBC's Atlanta branch, and she remained as the only female manager during the length of her employment. Cropley supervised Tipton as well as three other male managers in the Atlanta office. Each of the three male managers had been with CIBC for a number of years at the time Tipton began her employment. During her first three months with CIBC, Tipton had an excellent working relationship with Cropley. She testified at trial that during this time, Cropley went out of his way to

* Honorable Duross Fitzpatrick U.S. District Judge for the Middle District of Georgia, sitting by designation.

present Tipton to customers in a professional manner.

Tipton's problems with Cropley began when she brought to CIBC a complex joint venture financing transaction. Even though Tipton did not ask him to do so, Cropley brought in CIBC's Corporate Finance Group in Chicago to negotiate and handle the joint venture. While Tipton believed that Cropley's bringing in the Chicago Group was unique to her, the evidence showed that the Chicago Group had handled other complex transactions for managers in the Atlanta office including Cropley.

Once the Chicago Group became involved, they had the primary responsibility for negotiating, handling, and completing the deal. Tipton, however, still received credit for bringing the business to CIBC, and she had the ongoing responsibility to manage the client relationship. Tipton's limited scope in the transaction caused her to become dissatisfied and critical. She criticized Cropley's decision to bring in the Chicago Group as well as the Group's handling of the transaction. She continued to complain about the handling of the joint venture as long as she worked for CIBC.

In addition to her complaints about the joint venture, Tipton stated that Cropley placed severe restrictions on her communication with customers. In fact, Tipton testified that she was not allowed to discuss anything with anyone unless she received initial clearance from Cropley. The district court found, however, that the evidence presented at trial did not support Tipton's testimony concerning these restrictions. Specifically, the district court referred to several documents showing that Tipton had numerous contacts with both customers and law firms representing prospective customers outside of Cropley's presence.

Tipton's final complaint regarding Cropley involved a signing authorities memorandum that was circulated at CIBC's Atlanta office. In July of 1984, Cropley received a letter from his immediate supervisor in New York instructing him to review and establish control over signing authorities at the Atlanta agency. Signing authorities establish which individuals are authorized to sign or act for the Bank in certain specified matters. The signing authorities memorandum in question was prepared by Bill Jenkins, then Manager of Corporate Credit and Administration. Cropley reviewed and approved the memorandum without changing Jenkins' recommendations. The memorandum was then circulated throughout the office for acknowledgement and signature.

The memorandum reached Tipton's desk on August 31, 1984. Tipton refused to sign the memorandum and wrote an abrasive note to Cropley complaining that she was not given the same signing authority given to her peer, Bill Maron. Later in the day, Tipton came to Cropley's office, handed him a typed document, and told him that he was "terrified of New York," that she did not like the way he was "running things," and that he needed to "get his act together." Cropley attempted to explain to Tipton that her signing authority was different from Maron's due to her brief tenure and relative unfamiliarity with CIBC's policies and internal procedures. He pointed out that she had more than adequate signing authority to perform her duties, and that Maron had more signing authority only because an additional signature was needed when both Cropley and his deputy manager were away on business. CIBC's auditor also testified that Maron was given the additional signing authority only because of the few number of managers in the Atlanta office. When CIBC's Atlanta branch eventually hired another "operations manager," Maron's signing authority was discontinued.

At the time Tipton stated her protests concerning the memorandum, Cropley told her that he would consider removing Maron's name from the memorandum. On September 5, 1984, however, Cropley notified Tipton in writing that he had decided against removing Maron's name. Cropley delivered his decision to Tipton on September 5th, and a lengthy discussion ensued. During this discussion, Tipton complained that the various restraints Cropley had placed on her were interfering with her job and jeopardizing her credibility with cus-

tomers. Tipton again voiced her criticism of Cropley's decisions to bring in the Chicago Group on the joint venture transaction, and to retain Maron's name on the signing authorities memorandum. She further stated that she believed Cropley was discriminating against her, and she informed Cropley that she had the right to take legal action to oppose the alleged discrimination. Cropley again set forth his reasons for making the management decisions he had made. He also told Tipton that he was concerned about her ability to work under his authority.

When Cropley arrived at his office on the morning of September 7, 1984, he found on his desk a copy of a letter Tipton had sent to his superior in New York. In the letter Tipton raised her complaints about the handling of the joint venture transaction, the restraints on her communication with customers, and the limitations placed on her signing authority. The letter did not state that she had more than adequate signing authority to perform her duties, nor did it state that Cropley had given her a full explanation as to why Maron was given more signing authority than was she. Moreover, Tipton did not raise any allegations of sex discrimination in the letter.

After reading the letter, Cropley met with Tipton and informed her that he no longer had confidence or trust in her ability to perform her job functions in a manner consistent with CIBC's management style. Cropley told Tipton that her insubordinate comments and her inability or unwillingness to accept his authority were not conducive to continued performance of her duties. Cropley offered Tipton an opportunity to resign, but she refused. He then informed Tipton that she was terminated. Tipton, however, questioned his authority to take such action. After Cropley again informed Tipton that she was terminated, the deputy manager came in to assist with her departure.

## II. LEGAL ANALYSIS

### A. Retaliation Claim

■ Tipton argues that because the evidence showed she was fired because of her protests against alleged sex discrimination, the district court erred in ruling against her on the retaliatory discharge claim. The district court's ruling on the retaliation claim must be affirmed unless the findings of fact on which it was based are clearly erroneous. *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Where two permissible views of the evidence exist, "the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ Title VII prohibits an employer from discriminating against an employee who has opposed what she believes to be unlawful discrimination. 42 U.S.C.A. § 2000e–3(a) (1981). The employee need not prove the underlying claim of discrimination which led to her protest. *Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406, 1411 (9th Cir.1987); *Spence v. Local 1250, United Auto Workers of America*, 595 F.Supp. 6, 10 (N.D.Ohio 1984). Instead, an employee's opposition to discrimination is protected if she could reasonably form a good faith believe that the discrimination in fact existed. *Jurado*, 813 F.2d at 1411; *Spence*, 595 F.Supp. at 10.

The law is well-established in this Circuit that to establish a *prima facie* case of retaliatory discharge through circumstantial evidence, the plaintiff must show that she (1) engaged in protected opposition to Title VII discrimination; (2) that she was terminated simultaneously with or subsequent to such opposition; and (3) that there was a causal link between the protected opposition and the termination. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir.1986); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985); *Hamm v. Members of Bd. of Regents*, 708 F.2d 647, 654 (11th Cir.1983); *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 n. 8 (11th Cir.1983). If the plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge.

*See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The employer's burden of rebuttal is "exceedingly light." *Perryman*, 698 F.2d at 1142. Since the rebuttal burden is one of production only, the employer "need not persuade the court that it was actually motivated by the proferred reasons.... It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]." *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094.

If the employer articulates some legitimate, nondiscriminatory reason for the discharge, then the employee must be given the opportunity to demonstrate that the employer's reason is pretextual, *i.e.*, that it is "not the true reason for the employment decision." *Id.* at 256, 101 S.Ct. at 1095. The employee's burden of showing pretext "merges with [her] ultimate burden of persuading the court that [she] has been the victim of intentional discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 717, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983) (Blackmun J., concurring), *quoting Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1451 (11th Cir. 1987). Once the plaintiff has presented her evidence of pretext, "the trier of fact 'must decide which party's explanation of the employer's motivation it believes.'" *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed. 2d 718 (1984), *quoting Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482.

In the instant case, the district court found that Tipton's employment was terminated because of legitimate business reasons and not in retaliation for her opposition to alleged sex discrimination. Specifically, the district court found that Tipton was discharged because of her insubordination and her unwillingness to accept and abide by the nondiscriminatory

management decisions of her immediate superior, Cropley. The district court's conclusion that Cropley's decisions were nondiscriminatory was supported by its findings (1) that Cropley decided to involve the Chicago Group with the joint venture transaction, not because Tipton was a woman, but rather because it was a complex transaction that lent itself to handling by the Chicago Group in accordance with a legitimate bank policy; (2) that Cropley did not unreasonably restrict Tipton's communication with customers; and (3) that Cropley was justified in refusing to give Tipton more signing authority than was necessary to allow her to perform her duties.

In the final analysis, the district court found that Tipton was discharged because of her blatant challenges to Cropley's authority and her refusal to accept his decisions, not because she made one reference to sex discrimination two days before her termination. The district court was persuaded that her discharge was the direct result of her abusive and disrespectful conduct toward her superior since such conduct was clearly disruptive of his management.

Tipton contends that the district court erred in finding that she was discharged for legitimate business reasons, and in failing to associate her sex discrimination protest with her discharge. We disagree. The district court noted that Tipton had asserted she was being discriminated against two days before her discharge. Yet, after considering all of the evidence, the district court found that insubordination, not discrimination, was the reason for the discharge. In this case, two permissible views of the evidence were presented to the factfinder. The fact that the district court believed one over the other does not render its findings clearly erroneous. Therefore, we affirm the district court's ruling on Tipton's claim of retaliatory discharge.[1]

---

1. On appeal, Tipton does not challenge the district court's findings on the disparate treatment claim. Instead, Tipton argues only that the district court erred in ruling against her on the retaliation claim. To the extent Tipton's appeal can be viewed as challenging the district court's findings on the disparate treatment claim, however, we note that the district court's findings were not clearly erroneous, and therefore, must be affirmed. *See Pullman–Standard*, 456 U.S. at 287, 102 S.Ct. at 1789.

## B. *Contract Claim*

■ Tipton contends that the district court also erred in granting summary judgment to CIBC on her contract claims. Specifically, Tipton argues that the letter agreement she signed created a binding one-year contract of employment that CIBC breached by discharging her after she had been with the Company only four months. Since the district court construed the agreement as a matter of law, this court must review the district court's ruling on the contract claim *de novo. See Hercules Bumpers, Inc., v. First State Ins. Co.*, 863 F.2d 839, 841 (11th Cir.1989).

The issue on appeal is whether the employment agreement established a one-year contract or an at-will employment relationship. Tipton contends that three different provisions of the agreement support her argument that the agreement was a binding one-year employment contract: (1) the provision stating that she would be paid a salary of $43,000 per annum; (2) the provision requiring her to reimburse CIBC for her moving expenses if she terminated her employment within a one-year period; and (3) the provision which entitled her to three weeks vacation during the summer or four weeks during the winter.[2]

### 1. Salary Per Annum

■ O.C.G.A. § 34–7–1 provides as follows:

If a contract of employment provides that wages are payable at a stipulated period, the presumption shall arise that the hiring is for such period, provided that, if anything else in the contract indicates that the hiring was for a longer term, the mere reservation of wages for a lesser time will not control. An indefinite hiring may be terminated at will by either party.

O.C.G.A. § 34–7–1 (1988). Tipton relies on a 1981 Georgia Court of Appeals case which held that under section 34–7–1, "an 'offer of employment at so much per month will, in the absence of anything further indicating the period of employment intended, be treated as meaning employment for a term of one month.'" *Floyd v. Lamar Ferrell Chevrolet, Inc.*, 159 Ga.App. 756, 757–58, 285 S.E.2d 218, 219 (1981), *quoting Odom v. Bush*, 125 Ga. 184, 184, 53 S.E. 1013, 1013, (1906). Tipton contends that since she was offered a salary for a specific amount per year, the offer must be treated as meaning employment for a term of one year.

Other and later cases of the Georgia Court of Appeals, however, do not support Tipton's argument. In *Taliaferro v. S & A Restaurant Corp.*, 172 Ga.App. 399, 323 S.E.2d 271 (1984), the appellant attempted to argue that "the salary stipulation of $12,000 per year in the letters gives rise to the presumption that the hiring was for a period of one year under O.C.G.A. § 34–7–1." *Id.* at 400, 323 S.E.2d at 272. The Court of Appeals disagreed with this argument. The court noted that the salary provision in the letters did not give rise to the presumption set forth in section 34–7–1, but instead, the letters established an at-

---

**2.** The letter agreement provided as follows:

We refer to our recent interview with you and are pleased to offer you employment with the Bank as Manager, Corporate Banking, Atlanta at a commencing salary of $43,000 per annum effective the date you report. Accordingly, as discussed you will be entitled to 3 weeks vacation during the summer or 4 weeks during the winter.

We also confirm that the Bank will reimburse you reasonable relocation expenses to cover the cost of your personal transportation and transporting your household effects to Atlanta. We will also cover the cost of temporary housekeeping accommodation up to the period of one month while locating a permanent residence in that area. It will be necessary to provide us with a written estimate from the

moving company as soon as possible and prior to entering into any contract agreement. The above provision is made with the contingent that should you terminate employment with the Bank within a one year period, all expenses will become for your own account and the Bank must be reimbursed.

Please indicate your acceptance of this offer of employment by signing, dating and returning the attached copy of this letter by no later than April 18th. This offer of employment is subject to receipt of three satisfactory references including one from your most recent employer which we will obtain on your behalf.

We thank you for your interest in Canadian Imperial Bank and look forward to having you join our team.

will relationship between the parties that was subject to termination by either party at any time. *Id.*

In *Fortenberry v. Haverty Furniture Co., Inc.*, 176 Ga.App. 360, 335 S.E.2d 460 (1985), the appellant also attempted to argue that the stipulation of annual pay in a written agreement raised a presumption that the agreement established a one-year contract. The Court of Appeals rejected this argument holding that "the reference to appellant's annual salary in the written agreement merely established the total amount of his salary during a 12–month period and did not establish a pay period requiring application of the presumption under O.C.G.A. § 34–7–1." *Id.* at 360, 335 S.E.2d at 460.

And finally, in *Gatins v. NCR Corp.*, 180 Ga.App. 595, 349 S.E.2d 818 (1986), the Court of Appeals again held that an annual salary provision in an employment contract does not give rise to the presumption of a one-year contract under O.C.G.A. § 34–7–1. *Id.* at 597, 349 S.E.2d at 820. Specifically, the court stated that "[t]he computation of the salaries on an annualized basis does not turn this compensation term into a duration term." *Id.* The *Gatins* court also noted that the statement of an annual salary provision in a contract does not create an ambiguity as to the duration term of the contract. *Id.*

We agree with the district court below that in *Taliaferro, Fortenberry*, and *Gatins*, the Georgia Court of Appeals gave a literal interpretation to O.C.G.A. § 34–7–1. Under this interpretation, if the presumption under section 34–7–1 is to arise, the employment contract must provide that the "wages are payable at a stipulated period." Therefore, an annual salary provision in an employment contract will not establish the presumption under section 34–7–1 unless the employee is also paid on an annual basis. If the employee is paid on a weekly, bi-monthly or monthly basis, the statement of an annual salary will not create a binding one-year contract. The district court also correctly noted that this literal interpretation does not conflict with *Floyd* since

it appears that the employee in *Floyd* was paid at the stipulated period, monthly.

In the instant case, the evidence shows that Tipton was paid on a monthly or bi-monthly basis. Since she was not paid on an annual basis, the annual salary provision in her employment agreement does not establish a binding one-year contract. Consequently, O.C.G.A. § 34–7–1 does not support Tipton's argument that CIBC breached the durational term of her employment agreement.

2. Reimbursement for Moving Expenses

■ Tipton further contends that the provision stating that she would be required to reimburse CIBC for her moving expenses if she terminated her employment within a year was a liquidated damages provision giving rise to a one-year contract. The district court found that the reimbursement clause was not a liquidated damages provision and did not establish the existence of a binding one-year contract.

Under Georgia law, liquidated damages are given as compensation for an injury sustained due to the breach of a contract. O.C.G.A. § 13–6–7 (1982). In other words, liquidated damages "are a sum to be paid in lieu of performance." *Thorne v. Lee Timber Prod., Inc.*, 158 Ga.App. 226, 227, 279 S.E.2d 521, 522 (1981). We agree with the district court's ruling that the reimbursement provision in the contract was not a liquidated damages provision. If Tipton had chosen to leave her employment within the first year, she would not have breached the contract since the contract did not require her to stay a full year. Tipton was not obligated to work for CIBC for any definite time period. In fact, the contract contemplated that Tipton could terminate her employment at any time. The contract simply required Tipton to reimburse CIBC for the relocation expenses that had been provided to her if she did not work at least twelve months. Since the reimbursement provision did not contemplate the payment of damages in lieu of a breach, it cannot be construed as a liquidated damages provision.

### 3. Vacation Time

■ Tipton finally contends that the provision setting forth the number of weeks of vacation that would accrue annually also supports her position that the agreement was a binding one-year contract. We disagree. The vacation provision neither required Tipton to remain in her employment for a year nor obligated CIBC to retain Tipton for at least a year. Tipton has cited no case standing for the proposition that a vacation provision in a contract can be used to establish the durational term of that contract, and we refuse to hold as such today.

In sum, we agree with the district court that this employment agreement is unambiguous and states no definite term of employment. The three provisions Tipton refers to in the agreement do not support her position that this was a one-year employment contract, nor do they create an ambiguity as to the duration of the contract. Since the contract included no durational term, it established an at-will employment relationship that could be terminated by either party at any time. That being the case, CIBC was under no obligation to retain Tipton for a full year, and CIBC did not breach the contract by firing Tipton after she had been with the Company only four months.[3]

### C. *Inadmissible Evidence*

■ Tipton contests the district court's decision to admit into evidence a personal reference from a non-appearing witness. The reference was completed at Tipton's request by a business and social colleague of Tipton, and submitted by Tipton to the Emory University School of Business Administration in connection with her application to graduate business school. The reference stated, among other things, that "because of her strong intelligence [Tipton] sometimes works poorly with less skilled superiors." Tipton contends that this out-of-court statement was introduced to prove the truth of the matter asserted and does not fall within any exception to the hearsay rule.

CIBC contends that the statement was admissible under Federal Rule of Evidence 801(d)(2)(C), which provides in pertinent part:

> A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a person authorized by the party to make a statement concerning the subject.

Fed.R.Evid. 801(d)(2)(C). Tipton contends that she did not see the reference before it was submitted to Emory, and therefore, did not authorize such a statement concerning her job skills.

We need not decide whether the district court erred in admitting the statement. Assuming arguendo that the statement was improperly admitted, such error would not warrant a reversal unless the evidence was likely to have substantially swayed the court as the factfinder. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In the instant case, the district court cited several reasons for Tipton's discharge including her insubordinate remarks to Cropley, her inability to work under Cropley's authority, and her blatant challenges to Cropley's authority. We are unwilling to say that the statement in the reference substantially swayed the district court's decision-making process. Consequently, we hold that the admission of the statement, even if error, was only a harmless one.

### D. *Disqualification*

■ At the time Tipton filed the instant suit, she was being represented by another attorney in defense counsel's law firm in an unrelated property dispute. When defense counsel's law firm discovered the alleged conflict, it sent a letter to Tipton withdrawing their representation of Tipton in the property dispute. Tipton filed a motion to

---

**3.** Tipton concedes on appeal that she cannot pursue her fraud and tortious interference with employment claims in the absence of the underlying contract claims. Having affirmed the district court's grant of summary judgment on the contract claims, we also affirm the lower court's ruling on the fraud and tortious interference claims.

disqualify CIBC's counsel, but the motion was denied by the district court.

Tipton contends that attorneys or law firms must be disqualified from representing a party in a legal action if they have acquired knowledge of the affairs of an opposing party through an attorney-client relationship with the opposing party, and could use such knowledge to the detriment of the opposing party. *See* ABA Code of Prof. Resp., DR5–105(D); *American Can Co., v. Citrus Feed Co.*, 436 F.2d 1125 (5th Cir.1971); *Amoco Chem. Corp. v. MacArthur*, 568 F.Supp. 42 (N.D.Ga.1983). In this case, however, the attorney involved in Tipton's estate representation submitted an affidavit stating that she had never discussed her representation of Tipton with the lawyers in her firm representing CIBC except in immaterial ways specifically identified in the affidavit. Moreover, CIBC's attorneys attested that they had obtained no confidential information with respect to Tipton from the attorney representing Tipton in the property dispute. After reviewing the record and the applicable statutory and case law, we find that the district court properly denied Tipton's motion for disqualification.

E.  *Costs for Defending this Appeal*

Pursuant to 28 U.S.C.A. § 1912 and Rule 38 of the Federal Rules of Appellate Procedure, CIBC moves this court to assess damages and double costs against Tipton for bringing this "frivolous appeal." We do not agree that Tipton's appeal was frivolous, and therefore, CIBC's request for costs is hereby denied.

## III.  CONCLUSION

For the reasons stated above, we find that the district court properly granted summary judgment on Tipton's contract, fraud, and tortious interference claims, and properly denied Tipton's motion to disqualify CIBC's counsel. We also find that the district court's findings on Tipton's discrimination claims were not clearly erroneous.

Accordingly, we AFFIRM the rulings of the district court.