**Denise DUNNING, Plaintiff,**

v.

**NATIONAL INDUSTRIES, INC., etc., et al., Defendants.**

**Civ. A. No. 88–T–908–N.**

United States District Court,
M.D. Alabama, N.D.

Aug. 9, 1989.

nated against her because of her race and sex by forcing her to take an early maternity leave. Her final claim is that the company retaliated against her for having filed a charge of discrimination with the federal government by refusing to allow her to return to her job after the birth of her baby. The court's jurisdiction has been properly invoked pursuant to 42 U.S.C.A. § 2000e–5(f)(3).

Based on the evidence presented at a nonjury trial of this cause, the court finds against Dunning on her first claim and in her favor on her third claim. The court further finds in Dunning's favor on her second claim to the extent she charges race discrimination. Dunning is thus entitled to appropriate declaratory and injunctive relief.

Kenneth T. Hemphill, Donald R. Harrison, Montgomery, Ala., for plaintiff.

E. Scott Smith, Ginger C. Reed, Ford & Harrison, Atlanta, Ga., and Bruce J. Downey, III, Capell, Howard, Knabe & Cobbs, co-counsel, Montgomery, Ala., G. Paris Sykes, Jr., Ford & Harrison, co-counsel, Atlanta, Ga., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Denise Dunning, an African–American woman and a former employee of defendant National Industries, Inc., brought this lawsuit on September 1, 1988, charging National Industries with employment discrimination in violation of 42 U.S.C.A. §§ 2000e through 2000e–17, popularly known as Title VII of the Civil Rights Act of 1964, as amended.[1] Dunning makes the following claims. Her first claim is that National Industries discriminated against her because of her race and sex by transferring her against her will from one area of a company plant to another area. Her second claim is that the company discrimi-

## I. BACKGROUND

Dunning worked for National Industries in its factory in Montgomery County, Alabama, for three and one-half years, from 1984 through 1987. Dunning worked on the "boards," assembling wire harnesses for electrical systems. Like other employees working at the boards, Dunning had to stand upright in one place for long periods of time in front of the boards to construct the wire harnesses. The evidence showed that board work is difficult and physically demanding.

In late 1986, Dunning discovered that she was pregnant. Although she continued working, her pregnancy coupled with a change in workplace conditions affected her ability to work. In April 1987, National Industries's management transferred Dunning from the area at the back of the plant where she had been working to another part of the plant. The boards in the area to which Dunning was moved were located near machinery used to mold plastic components for the electrical systems produced by the plant. Because these machines generated heat, temperatures in the new area were somewhat higher than in

1. The defendants also include several officers of National Industries, Inc.: June Collier, President of National Industries, James Collier, a National Industries plant manager, and Dan Carden, a supervisor for the company. Since these officers are all sued in their capacity as officers of National Industries, the court has not treated them separately in this opinion.

her former location. Dunning, who was especially sensitive to the heat because of her pregnancy, found work in the new location very uncomfortable. In addition, Dunning had to interrupt her work often to go to the restroom and to drink water. As a result of her discomfort and these frequent interruptions, Dunning's work productivity declined.

On the first day that she worked at the boards near the molding machines, Dunning complained to the lead woman at her work area that the heat made her ill, and asked if she could get some ice to relieve her discomfort. The lead woman contacted the departmental supervisor, Dan Carden, about this request. Carden denied the request and brought Dunning to the office of James Collier, a plant supervisor. There, Dunning repeated her request for some ice. Collier denied this request, commenting that Dunning's pregnancy "wasn't his fault," and asking her whether she had air conditioning at home or in her car. Dunning then asked if she could go home early that day. Collier replied that if Dunning did so, she would be fired. Dunning worked the rest of that day and two more days after that in the new location. She repeated her complaints about the heat to Carden. On the third day, Carden called Dunning in to his office to caution her that she was not meeting her production quota. Dunning asked to be transferred to an area of the plant with cooler temperatures and better ventilation, such as the area in which she had previously worked. Carden refused this request and stated that Dunning's pregnancy was not his problem. Carden did tell Dunning that if she obtained a doctor's excuse, then he would move her to a different part of the plant.

Dunning went to her doctor's office the following morning and the doctor issued her a note stating that she was under his care and that she should not work near excessive heat. Dunning brought this note to James Collier at National Industries. James Collier forwarded the note to June Collier, National Industries's president, and instructed Dunning to return to work. Later that day, Carden accompanied Dunning to June Collier's office. June Collier rejected the medical excuse, refused Dunning's request for a transfer, and informed her that she had four options. She could return to work, quit her job, accept a layoff, or take early maternity leave. Since National Industries would not accommodate her by moving her away from the molding machines, Dunning felt herself forced to choose early maternity leave as the least objectionable of four bad options.[2]

Dunning gave birth to her child on July 12, 1987. She expected to return to work some time thereafter at National Industries. She had heard from other employees at the plant that she could return to work only with authorization from her doctor after a six-week checkup. Dunning therefore made an appointment for such a checkup to be conducted on August 27, 1987. That appointment was postponed when Dunning's physician had to perform an emergency delivery, however, and the check-up did not occur until September 11, 1987. Dunning experienced a further delay when the doctor's office insisted on issuing an authorization slip stating that Dunning could return to work as of August, rather than as of September. Dunning wanted the statement to reflect her ability to return to work as of the time of the check-up, fearing that National Industries would suspect that she had stayed off

**2.** After receiving the excuse from James Collier, June Collier called Dunning's physician to verify her medical excuse. During her telephone conversation with a member of the doctor's office, some confusion developed as to whether Dunning had stated to her physician that she worked near steam. June Collier later accused Dunning of having intentionally misrepresented to her doctor that she worked near steam. The court is convinced, and so finds, that Dunning did not inform her doctor that she worked near steam. The note Dunning received from her doctor to take to National Industries did not even mention steam.

The court cannot say how this confusion regarding the steam first arose; the record is simply unclear. This issue is in any event not critical to the case, because June Collier did not base her refusal to accommodate Dunning on her belief that Dunning had misrepresented matters to the doctor.

work without justification beyond six weeks after her baby's birth. During the delay in obtaining a statement from the doctor's office, Dunning was in frequent contact with both the doctor's office and National Industries. She informed National Industries's personnel department of the delay in obtaining a work authorization, and that office responded that she would be able to return once she acquired the authorization. Dunning's husband had also been in contact with National Industries, informing the company of her status and her expectation to return to work.

Meanwhile, Dunning had obtained legal advice from a staff attorney at the Legal Services Corporation of Alabama, regarding National Industries's response to her complaints prior to taking maternity leave. With the help of this attorney, Dunning filed a complaint with the Equal Employment Opportunity Commission (EEOC) on August 24, 1987, alleging that National Industries had discriminated against her on the basis of her race and sex in refusing to grant her request for a transfer to a cooler area of the plant.[3]

Dunning finally received a work authorization document from her doctor in mid-October 1987. She informed National Industries over the telephone that she had received the authorization, and soon thereafter Dunning and her husband went to the plant to submit the physician's statement. Dunning's husband went into the plant with the statement, while Dunning remained in the car with her baby. An employee at National Industries instructed Dunning's husband to have Dunning report to work at the plant the following Monday with her doctor's authorization. However, when Dunning called Monday morning before leaving for work, the personnel director informed her that she could not return to work at National Industries, and would have to reapply for a position at a starting wage below what she made prior to taking her maternity leave. Dunning then filed this suit.

## II. DISCUSSION

Dunning challenges three distinct, though related, decisions by the defendants. First, she asserts that, on the basis of her race and sex, National Industries transferred her from the cooler area of the plant to the area near the molding machines. Second, she asserts that, on the basis of her race and sex, National Industries forced her to take early maternity leave without pay while she was still able to work. Finally, Dunning contends that National Industries refused to allow her to return to work after her leave because she had filed a complaint with the EEOC.

■■■ To determine whether Dunning has been a victim of discrimination and retaliation, the court applies the same analytical framework to each of the employment decisions challenged by Dunning. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986).[4] Under this framework, Dunning bears the initial burden of establishing by a preponderance of the evidence a *prima facie* case of a practice proscribed by Title VII: either race discrimination, sex discrimination, or retaliation. Many different articulations of the Title VII *prima facie* case exist, varying with the context of the employment decision and the type of proscribed practice involved.[5] The essence of the *prima facie*

---

**3.** The defendants stipulated at trial that Dunning had satisfied all jurisdictional prerequisites associated with her Title VII claims.

**4.** Dunning also alleges violations of 42 U.S.C.A. §§ 1981 and 1985. The court need not resolve whether Dunning has viable independent claims of intentional discrimination and retaliation under these two statutes. Assuming that she has, the court would find in her favor and against her to the same extent it has done so under Title VII. Moreover, the court does not understand Dunning to seek any relief under these two statutes that is not available under Title VII.

**5.** The court adapts the *prima facie* case both to the type of employment decision challenged, *see, e.g., Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1538–39 (hiring) *reh'g granted and opinion modified in other respects*, 848 F.2d 1522 (11th Cir.1988); *Taylor v. Hudson Pulp and Paper Corp.*, 788 F.2d 1455 (11th Cir. 1986), *cert. denied*, 484 U.S. 983, 108 S.Ct. 345, 98 L.Ed.2d 371 (1987) (transfer); *Wu v. Thomas*, 847 F.2d 1480, 1483–84 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989) (promotion); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir.1987) (discharge); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d

case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the factfinder that the employer used prohibited criteria in making an adverse decision about the employee.[6] Thus, the unifying themes of the various manifestations of the *prima facie* case are that the employee is a member of a protected group and that the employer has treated that employee differently from other members outside that protected group under the same or similar circumstances, to the employee's detriment.

If established, this *prima facie* case raises a presumption that the employer is liable to the employee under Title VII. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer did take unlawful action against the employee. The employer can meet this burden of production by articulating a le-

gitimate, nondiscriminatory and nonretaliatory reason for the employment decision, a reason which is clear, reasonably specific and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. *Id.*, at 253–55, 101 S.Ct. at 1093–94; *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494–95 (11th Cir.1989).

Once the employer satisfies this burden of production, the focus shifts back to the employee's ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination or retaliation. The employee may meet this ultimate burden by persuading the court either directly that a discriminatory or retaliatory reason more than likely motivated the employer or indirectly that the proffered reason for the employment decision is not worthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.[7] In the

1181, 1184–86 (11th Cir.1984) (discriminatory application of work rules), and to the type of discriminatory practice alleged. *E.g.*, *Maddox v. Grandview Care Center, Inc.*, 780 F.2d 987 (11th Cir.1986) (pregnancy); *Donnellon*, 794 F.2d at 600–01 (retaliation).

**6.** When an employee presents direct evidence of the employer's discriminatory or retaliatory motive, the framework set out in the text is substantially altered. In such a case, the employer bears more than a mere burden of production of a legitimate reason for the decision; the employer bears the burden of proving by a preponderance of the evidence that it would have made the same decision even if it had not used the proscribed criteria. *See Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring in the judgment) (espousing direct evidence threshold); *Jones v. Gerwens*, 874 F.2d 1534, 1539 n. 8 (11th Cir.1989) (in dicta, apparently adhering to direct evidence threshold). *But cf. Price Waterhouse*, — U.S. at —, 109 S.Ct. at 1791 (plurality opinion) (declining to require direct evidence in all cases as a prerequisite to imposing burden of proof on employer); *id.*, — U.S. at —, 109 S.Ct. at 1795 (White, J., concurring in the judgment) (unlawful motive must be a substantial factor in the decision, but unclear whether this requires a showing of direct evidence). Although the question of whether a plaintiff has presented direct evidence is not always entirely clear, direct evidence relates to

actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee. *See Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.1988); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

The court finds that Dunning has not presented direct evidence of discrimination or retaliation on the part of the defendants, and thus applies the usual *Burdine* shifting analysis. The comments of James Collier and Dan Carden, to the effect that Dunning's pregnancy was not their fault or their problem, can certainly be criticized as callous and insensitive. They do not reflect an attitude of treating pregnant employees differently from other employees, however, but rather reflect that indifference to health complications arising from working conditions is the prevailing and general ethic at National Industries. In any event, even if National Industries had the burden of establishing that it would have reached the same decision in the absence of the prohibited motive, the court would have reached the same conclusions as to all of Dunning's claims.

**7.** Where, as here, a disparate treatment Title VII case has been fully tried, the court need not employ the full *Burdine* analysis, but may sim-

final analysis, the question is whether the employee, in this case Dunning, has demonstrated by a preponderance of the evidence that her employer, National Industries, discriminated or retaliated against her in violation of the strictures of Title VII.

### A.

■ As to the first employment decision challenged by Dunning, the court finds that National Industries did not transfer Dunning to the boards near the molding machines because of her race or sex. Dunning has not even established a *prima facie* case of discrimination. She has produced no credible evidence that white employees or male employees were treated differently from her regarding the transfer. Moreover, National Industries has articulated a persuasive, nondiscriminatory reason for transferring Dunning. Because the area where Dunning had worked before the transfer had become crowded, National Industries moved some boards, including Dunning's, to a less crowded area of the plant. Dunning was simply moved along with her board. She has not shown this reason to be pretextual. The evidence establishes and the court finds that National Industries identified only boards that it wished to move, without regard to the identity of the employees stationed at those boards.[8]

### B.

■ Dunning next argues that, because of her race, National Industries refused to transfer her to a cooler area of the plant and effectively forced her to take early maternity leave without pay, when she could have continued working until a relatively short time before the birth of her child. The court agrees. As described in more detail below, Dunning proved a *prima facie* case of such discrimination by presenting compelling evidence of how National Industries treated pregnant white women differently from her under similar circumstances.[9]

National Industries accommodated two white women, Cecilia Skipper and Katie Moncrief, with light duty work because of

ply proceed directly to the ultimate issue of discrimination or retaliation. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Moore v. Alabama State University,* 864 F.2d 103, 105 (11th Cir.1989). The court believes that trial courts should nonetheless use the *Burdine* analysis in fully tried cases in which the plaintiff relies on circumstantial evidence. Such cases pose difficult and sensitive issues of subjective intent and objective action. The *Burdine* analysis provides an invaluable method of weighing and considering evidence. By focussing the court's inquiry on the *prima facie* case, the employer's justification, and the issue of pretext, *Burdine* helps to assure that the court arrives at its ultimate conclusion less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dep't of Environmental Management,* 872 F.2d 361, 365 n. 4 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984).

Of course, the *Burdine* analysis should not be applied too rigidly; nor should it be viewed as an end in itself. In other words, it should not be used by the court as a "substitute" for reaching the ultimate issue of whether the plaintiff has, in fact, been a victim of discrimination or retaliation. *Moore,* 864 F.2d at 105.

8. At one point during trial, Dunning also contended that National Industries transferred her out of a desire to get rid of her because she was pregnant. However, Dunning offered no credible evidence that nonpregnant employees were treated differently from pregnant women in this regard. As stated in the text, National Industries identified only the boards to be transferred, not the employees, nor their sex or race, nor whether they were pregnant.

9. Dunning also contends that National Industries discriminated against her on the basis of her sex in forcing her to take this leave. The exact nature of this claim is unclear, however, inasmuch as Dunning offered no evidence on National Industries's policy with respect to men experiencing difficulty at work because of medical problems. *Cf. Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 990–91 (11th Cir. 1986) (finding that an employer's policy limiting maternity leave to three months while placing no express time limit on sick leave was facially sexually discriminatory). *See generally* Annot., *Pregnancy Leave or Maternity Leave Policy, or Lack Thereof, as Unlawful Employment Practice Violative of Title VII of the Civil Rights Act of 1964 (42 USCS §§ 2000e et seq.),* 27 A.L.R.Fed. 537 (1976). Since Dunning is entitled to relief on her theory of race discrimination, the court need not and does not reach her claim of sex discrimination on this particular adverse employment decision.

their pregnancies. In Skipper's case, she became sick during her pregnancy, and the company moved her at her request from the boards to "assembly work" which was not as physically difficult. The company also transferred Skipper without first demanding a doctor's excuse. In the case of Moncrief, she could not meet required production levels on the boards and was frequently absent because of her pregnancy. National Industries did not require that she go on maternity leave or quit, but rather transferred her at her request to lighter duty work, such as "spot taping," "plugging wires" and assembly work.[10]

■ In rebuttal, National Industries's president testified that the company's beneficial policy toward pregnant women was limited to allowing them maternity leave without pay. She stated that the company did not accommodate pregnant women by transferring them to light duty positions. She stated further that she simply applied this neutral policy to Dunning. The court is convinced, however, that the reason given by National Industries's president for application of the policy in Dunning's case was a pretext for race discrimination. As shown above, the company accommodated two pregnant white women but did not do the same for Dunning. The court finds that this difference in treatment was based on the women's race.

In reaching this conclusion, the court has also considered the fact that National Industries has no written policy regarding maternity leave; indeed, the company has no written personnel policies at all. The company's maternity leave policy, as described by June Collier, is as follows: The company, as stated earlier, does not provide any special accommodations to pregnant women at work. Instead, an employee may leave work within four weeks of the expected date of birth without a doctor's excuse, but if she wishes to leave prior to four weeks before the due date, then she must have a medical excuse. An employee must present a doctor's authorization when she returns to work at National Industries after the birth of her baby. She may return to work as soon as she desires and is able, but she must call the company six weeks after the birth of her child if she has not yet returned and wishes to remain on leave longer than six weeks. She must get a formal extension to remain off work past this six-week period, and must bring a doctor's authorization with her when she returns.

Since the company has not taken the step of establishing a written personnel policy, it relies on verbal communication of the maternity leave policy to employees at the time of the hiring interview. The company does not consistently convey this information to its employees, however; several employees testified that they were not told a thing about maternity leave policy during their orientation, or afterward, except through the employee grapevine. The evidence also reflected that employees often forget the substance of the company's maternity leave policy if several years pass between its oral rendition during orientation and the employees' pregnancies.

■ June Collier, National Industries's president, nevertheless testified that she preferred an unwritten personnel policy. And, of course, she was entitled to maintain the company's policy in that form; Title VII does not require employers to set their personnel policies down in writing. Cf. Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499–1500 (11th Cir.1985) (fact that employer has not reduced discharge standard to writing does not mean that the standard is too subjective to serve as justification). However, this court cannot overlook that unwritten policies, as opposed to written policies, can be easily turned into tools of discrimination. National Industries has no documentation of exactly what its personnel policy is; nor can it produce documentation reflecting that all employees are aware of the policy, or, if aware,

---

**10.** The record contains additional evidence that National Industries accommodated another white woman, Carol Dandridge, during her pregnancy by giving her a sit-down job. Because the testimony regarding Dandridge was essentially second-hand, the court has accorded it little weight.

that they understand the policy correctly. These circumstances allow for more discretionary, and therefore potentially more discriminatory, enforcement of the policy. Indeed, as stated, the court is convinced that National Industries enforced its unwritten policy in an intentionally discriminatory manner. The company's rule of no accommodation for pregnant workers, other than early maternity leave, was enforced against Dunning but not against two white women.[11]

### C.

■ This leaves National Industries's refusal to allow Dunning to return to work in mid-October 1987. Upon consideration of the evidence adduced at trial, the court finds that National Industries made this employment decision in retaliation for Dunning's filing a claim with the EEOC.

■ Dunning has established a *prima facie* case of retaliation. Title VII explicitly protects employees against retaliation by an employer for participation in an employment discrimination case, including participation in the form of filing a complaint with the EEOC.[12] Dunning filed such a claim in August 1987. National Industries made the challenged adverse employment decision in October 1987, shortly after receiving a copy of the complaint from the EEOC with a request for the company's position on the matter. The fact that the decision occurred in the same time frame as the receipt of the EEOC complaint and the communication with an EEOC officer establishes the necessary causal connection between National Industries's decision and Dunning's challenge to its employment practices to make out a *prima facie* case of reprisal. *See Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir.1986); *Jordan v. Wilson,* 649 F.Supp. 1038, 1061 (M.D.Ala.1986); *see also Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989).

■ In rebuttal, National Industries basically relies on the fact that Dunning violated its maternity leave policy, as described above. National Industries asserts that it must assume at some point that an employee who remains on maternity leave for an extended period of time has quit, so that the company can hire a replacement for the employee. National Industries contends that Dunning never contacted it in any way to let the personnel department know of her difficulty in obtaining an excuse from her doctor.

The court is convinced that these proffered reasons for the company's decision are purely pretextual, and that Dunning was actually barred from returning to her job because of the fact that she filed a complaint with the EEOC. First of all, the court finds that Dunning did actually keep National Industries's personnel office apprised of the initial delay in her checkup arising from her doctor's emergency as well as the later delay in obtaining a written excuse from this office. Dunning

---

11. *Cf. Williams v. City of Montgomery,* 742 F.2d 586, 587–88 (11th Cir.1984) (per curiam), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985) (racially discriminatory application of presumably neutral work rule regarding reinstatement); *Sims v. Montgomery County Commission,* 544 F.Supp. 420, 426 (M.D.Ala.1982) (uneven application of neutral work rules on racial lines is strong evidence that the rules were never meaningfully employed, and were retained as a pretext to discriminate against disfavored employees).

The evidence adduced at trial reflects that National Industries's president, June Collier, was intimately involved in the enforcement of her unwritten personnel policy. She either made the company's personnel decisions herself or closely monitored the personnel decisions of the officers below her in company hierarchy.

The court is therefore convinced that she was more than likely fully aware of the uneven application of National Industries's personnel policy as detailed in this memorandum opinion.

12. Title VII's protection attaches to the filing of such a complaint with the EEOC; the employee need not prove the merits of her EEOC complaint to establish her retaliation claim. "[R]ather, the plaintiff need only have had a 'reasonable belief' that an unlawful employment practice was occurring." *Wu v. Thomas,* 863 F.2d 1543, 1549 (11th Cir.1989). Considering the circumstances giving rise to Dunning's EEOC complaint, the court finds that she plainly had a reasonable belief that National Industries was committing an unlawful employment practice against her.

called the company on numerous occasions to inform them of this, and Dunning's husband personally conveyed this information to the personnel office on several occasions as well. The EEOC officer assigned to Dunning's case testified that he spoke with National Industries's personnel office shortly before Dunning attempted to return to work on the 19th of October. At that time, the company told him that Dunning had not returned to work because she had experienced some sort of difficulty in obtaining her medical authorization statement, and that once she obtained that statement she could resume her job.[13] Secondly, employees at National Industries's personnel office testified at trial that they would contact an employee's doctor's office directly on behalf of an employee who was experiencing difficulty in obtaining her medical authorization to return to work, but no one at the company did so for Dunning.

To the extent National Industries contends that it had to replace Dunning at her position, this argument carries little weight. Personnel employees at National Industries stated that the six-week deadline is not rigorously enforced, and that there is no set period beyond the six-week deadline at which the company treats an employee as having quit. Rather, the company approaches each case on a subjective, case-by-case basis. The company's president stated that National Industries at any given time has a large number of pregnant employees—indeed, so large that they outnumber the amount of sit-down jobs available at the plant. She also testified that the company immediately replaces any employee on leave. In light of the company's policy to transfer employees from position to position (from the board to the splicing machines, etc.) as needed and the significant number of pregnant employees, National Industries obviously maintains a large supply of temporary labor designed

specifically to report only when the company needs replacement or additional help.

Indeed, Dunning provided evidence of specific instances where National Industries did not enforce at all its purported policy regarding returns from maternity leave. For example, Cecilia Skipper, the white employee discussed earlier in this opinion, was allowed to return to her position by National Industries after her maternity leave even though she stayed on leave beyond six weeks after her child's birth. Skipper testified that she simply returned to National Industries when she wanted to, and that she had not been in communication with the company to let them know that she would not return by the six-week deadline. Moreover, Skipper did not have a doctor's authorization to return to work, as supposedly required by the policy. Dunning, in contrast, was not given the benefit of this lenient return policy.[14] The court is convinced that National Industries's purpose in strictly enforcing this policy against Dunning was retaliation for her having filed a complaint with the EEOC. This purpose clearly does not comport with the mandate of Title VII.

### III. CONCLUSION

The court is convinced that Dunning was forced to take early maternity leave by National Industries because of her race. The court is also convinced that National Industries refused to permit Dunning to return to her job in retaliation for her having filed an EEOC complaint against the company. Dunning is therefore entitled to appropriate relief. As a victim of such retaliation and discrimination, Dunning is entitled to backpay and reinstatement in her former position, with the concomitants of employment which would have accrued to her absent these violations of her civil rights. 42 U.S.C.A. § 2000e–5(g); *see Franks v. Bowman Transportation*

---

**13.** National Industries hired a new personnel director between the time Dunning left on her maternity leave in April and the time she attempted to return to her job in October. Whether the new personnel director personally communicated this information to the EEOC officer or not was not clearly established at trial, but this was clearly the company's position with respect to Dunning prior to the EEOC officer's contact with the company about Dunning's complaint.

**14.** *See* note 11, *supra*.

*Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420–21, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). The court informed the parties at trial that this opinion would address only the liability aspect of the case. The court will now give the parties an opportunity to agree upon the appropriate amount of backpay and other benefits Dunning should receive. If the parties cannot reach an agreement on this issue, then the court will itself determine, after an appropriate hearing, how much Dunning should receive. In addition, Dunning is entitled to reasonable attorneys' fees under 42 U.S.C.A. § 2000e–5(k).

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiff Denise Dunning and against defendants National Industries, Inc., June Collier, president of National Industries, James Collier, a plant manager for National Industries, and Dan Carden, a supervisor for National Industries, on the following two claims: (a) on plaintiff Dunning's claim that the defendants discriminated against her because of her race by forcing her to take an early maternity leave; and (b) on her claim that the defendants retaliated against her for having filed a charge of discrimination with the federal government by refusing to allow her to return to her position after the birth of her baby;

(2) That all defendants be and they are hereby ENJOINED and RESTRAINED from failing to reemploy plaintiff Dunning within 14 days from the date of this order, with such accompanying promotions, pay increases, and other benefits that plaintiff Dunning would have received had she not been illegally forced to take early maternity leave and prevented from returning to her job by the defendants;

(3) That plaintiff Dunning have and recover backpay, determined according to accepted legal principles, from the defendants;

(4) That plaintiff Dunning be and she is hereby allowed 14 days from the date of this order within which to file her request for reasonable attorneys' fees, which request shall address each of the criteria set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974);

(5) That all parties to these proceedings be and they are hereby allowed 14 days from the date of this order within which to file a request for the court to determine appropriate backpay, should the parties be unable to agree between themselves as to the amount of backpay to which plaintiff Dunning is entitled; and

(6) That all other relief sought by the plaintiff Dunning in this case that is not specifically granted be and the same is hereby denied.

It is further ORDERED that all costs of this proceeding be and they are hereby taxed against the defendants, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.