Roosevelt **WORTHY**, Plaintiff,

v.

Sheila E. **WIDNALL**, Secretary of the Department of the Air Force, Defendant.

No. 5:94–cv–255–3 (WDO).

United States District Court, M.D. Georgia, Macon Division.

Sept. 12, 1995.

Robert E. Bergman, Warner Robins, GA, for plaintiff.

Frank L. Butler, III, Macon, GA and Anna T. Smith, U.S. Air Force, General Litigation Division, Arlington, VA, for defendant.

### ORDER

OWENS, District Judge.

Plaintiff's Title VII complaint alleging race discrimination in employment was properly filed after he exhausted administrative procedures. Depositions of all key witnesses have been taken; the court has read them. Defendant now contends that it is entitled to entry of summary judgment in its favor on plaintiff's claims against her. After carefully considering the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

### I. FACTS

Roosevelt Worthy, plaintiff, is a black male who has been an electrical worker at Robins Air Force Base since August 1974. Since he began there, plaintiff has remained at grade level WG–8. During the time frame during which the complained of events occurred, plaintiff was assigned to the Directorate of Maintenance, Airborne Electronics Division, Production Branch, Communications Section. His supervisor at all relevant times was Earl Reneman.

#### A. Escort Duties

The trouble began when certain sections on the base were required to furnish the visitor control center with escorts. Section heads such as Reneman were required, when requested by the visitor center, to send one

of their employees to perform "escort duty." Operating procedures required that, when selecting employees to serve "escort duty", supervisors "[s]elect the lowest grade employee available, considering workload requirements. [Supervisors should furthermore e]nsure that escort duties and overtime are assigned in a *fair manner* and all existing regulations and policies are upheld."

In plaintiff's section, he was among the lowest grade employees (WG–8) available for assignment of escort duty. There were a total of four WG–8's from whom Reneman might select when called upon to supply the visitor control center with an escort. Three were white males, and plaintiff (the fourth) was a black male. One of the three white males, Curtis Hostutler, suffered from back injuries, and was one month away from retirement when the complained of incidents occurred.

In an effort to ensure a "fair" distribution of escort duty, Reneman adopted a rotation schedule; however, his understanding was that use of such a method was not required. In a perfect world, the rotation system would have divided equally among the employees the frequency with which escort duty was required.[1] However, in the Communications Section where plaintiff worked, and Reneman supervised, the world was simply not perfect. Requests by the visitor's center for an escort were sporadic, and unpredictable. So when Reneman was called, and an escort was requested, he had no way of ensuring that the individual who the rotation designated as next in line for escort duty would be in the area. When that was the case, Reneman would simply have to call upon someone who was available.

Based upon both the rotation system and availability at the moment of the escort re-

quest, Reneman knew who he would send as soon as he was contacted by the visitor center. (Reneman, at 8–9). The visitor center could only provide Reneman with a ballpark estimate of the length of a time an escort would necessitate. Reneman's overriding concern was to stay within the confines of the rotation, to the extent that the individual designated by the rotation procedure was available. (*Id.*).

The months during which plaintiff alleges that assignment of escort duty were discriminatory are February and March 1993. (Worthy, at 17). In the court's best attempt at understanding what it is that plaintiff complains about in February, it seems that he is disgruntled by a discrepancy he alleges occurred in record-keeping with respect to the number of hours served by Hostutler on either the 8th or the 9th. In regard to March, it appears that plaintiff complains that the situation is unfair because whites get the short duty and he (a black) gets the long duty.[2]

The hours served for the months of January, February, and March 1993 are as follows (first number indicates date, second number is hours served):

|  | January | February | March |
|---|---|---|---|
| Hodge | 19–8 | 9–8 | 1–1 |
|  |  |  | 12–3 |
|  |  |  | 15–1 |
|  |  |  | 9–2 |
| Hostutler | 7–8 | 8–8 | XXX |
| Rhodes | 25–8 | 15–2 | 15–3 |
|  |  | 23–3 | 29–2 |
| Worthy | 11–8 | 2–8 | 1–8 |
|  |  |  | 22–3 |

(Worthy, exh. 9).[3] This list is consistent with that attached to plaintiff's complaint as exhibit 1, which was prepared by plaintiff. Thus the three month total for Hodge (WM) was 23 hours (8 + 8 + 1 + 3 + 1 + 2),

---

1. No matter what, though, the rotation system could not have assured equal distribution of hours, since the length of time an employee served on escort duty was a function of the visitor center, not the particular section from which escort duty assignments were made. (Worthy, at 25). Once a person came up on the rotation system, the length of hours served by him was more a product of luck of the draw than anything else. Actually, the length of time one is required to serve as an escort is determined by the time that the visitor to whom the escort is assigned chooses to remain on the base.

2. As noted above, the length of duty served is beyond the control of the supervisor. The length of escort duty is determined by the visitor's length of stay.

3. The court also notes that white employees served more escort duty hours in April, June, and July 1993 than did plaintiff. Plaintiff claims that defendant cannot defend the challenged conduct on the basis of subsequent actions.

which accrued through 6 different occasions; Hostutler (WM) *received credit* for 16 hours (8 + 8), which did not include any hours for March (he retired on March 31); Rhodes (WM) served a total of 18 hours (8 + 2 + 3 + 3 + 2) on five different occasions; and Worthy worked a total of 27 hours (8 + 8 + 8 + 3) on four different occasions.

Plaintiff's general complaint is that the rotation system was unfair in that it did not ensure equal division of hours served, and this caused him to serve more total hours over the course of a three month period. Moreover, plaintiff alleges that Hostutler was given credit for hours others worked in his stead, and that discrepancies in record-keeping with respect to Hostutler's hours demonstrate the unfairness in the system used. Plaintiff cites this as evidence of the fact that the rotation system was not adhered to by Reneman. (Plaintiff's Facts, at ¶ 10).

### B. Performance Appraisals

Each year employees have their work critiqued by means of a Performance Appraisal, which their immediate supervisor and second-level supervisor sign off on. For the years 1989, 1990, 1991, 1992, and 1993 plaintiff received a "fully successful" rating. Although "fully successful" is apparently insufficient for certain promotions, plaintiff admits that it is not a "negative" review. Respectively, plaintiff's scores on those reviews were 61, 62, 62, 62, and 62.

During 1989, 1990, and 1991, plaintiff's performance was assessed by neither the same rater or reviewer as his 1993 appraisal. Although Mr. Reneman was the rater on both the 1992 and 1993 appraisals, there was a different reviewer each year. The results of the appraisals, which assign scores between one and nine (nine being the highest) in several different categories, for 1992 and 1993 are as follows:

| | 1992 | 1993 |
|---|---|---|
| work effort | 9 | 9 |
| adaptability to work | 7 | 7 |
| problem solving * | 6 | 8 |
| working relationships * | 6 | 5 |
| communication * | 6 | 5 |
| work productivity | 9 | 9 |
| self-sufficiency | 6 | 6 |
| skill in work | 7 | 7 |
| work management | 6 | 6 |
| TOTAL SCORE | 62 | 62 |

* categories in which a different score was assigned for 1992 and 1993

*See* Defendant's Undisputed Facts, at ¶¶ 23–24. Although plaintiff was rated lower in two categories for 1993 for a total of 2 points, he was also raised 2 points in a third category. The net effect was to render the result the same as the previous year.

Plaintiff claims that this evaluation is biased because a white co-worker received a higher appraisal score even though plaintiff assembled more units than the white co-worker. Plaintiff says that although he received below-standard marks in certain categories, he never received counselling regarding the same from superiors. Plaintiff further argues that there is a clear connection between low scores in the categories of "working relationships" and "communication" and the EEO complaints filed by him. His theory of reprisal is bolstered by his allegation that Reneman told him his scores in those categories would improve if he'd just stop filing complaints.

Defendant, however, points to complaints by black and white co-workers alike concerning their inability to work effectively with plaintiff. Alfred Collier (BM) asked not to be placed near plaintiff on the same aisle because he could not get along with plaintiff. (Reneman, at 23–25). Another black female also complained to Reneman that she did not like working with plaintiff. (*Id.* at 32–33). Larry Martin (BM) and Joe Gallimore (BM) had also registered complaints with plaintiff's supervisors regarding their difficulty in working with him. (Cannon, at 15–16).

In light of this, plaintiff also claims that his annual performance appraisal for the year 1993 (covering July 1, 1992 through June 30, 1993) is infected by racial bias and/or is the result of a reprisal for his EEO activities, and would have been higher but for that fact.

## II. DISCUSSION

### A. Summary Judgment

#### 1. Generally

Federal Rule of Civil Procedure ("FED. R.CIV.P.") 56(c) provides that summary judg-

ment may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is [1] no genuine issue as to any material fact and that [2] the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Irby v. Bittick,* 44 .F.3d 949, 953 (11th Cir.1995).

■■ Under the first element, the issue must be *genuine,* and the factual dispute must be *material* to the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Materiality" is determined by reference to the substantive law that controls the case. *Id.; Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 590 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994). For a question of fact to be "genuine," the party opposing summary judgment " 'must do more than simply show that there is some *metaphysical doubt* as to the material facts,' " *Irby,* 44 F.3d at 953 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986))—the evidence must be of such a quality that "a reasonable jury could return a verdict for the nonmoving party. * * * If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 248, 249–50, 106 S.Ct. at 2510, 2510–11. Only those doubts about facts that are *reasonable* must be resolved in favor of the nonmovant. *Irby,* 44 F.3d at 953 (citing *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990)).

■■ The second element—that the movant be entitled to judgment as a matter of law—is satisfied where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a party has moved for summary judgment and properly supported its motion, the burden shifts to the nonmovant to create, through the evidentiary forms listed in FED.R.CIV.P. 56(c), genuine issues of material fact necessi-

tating a trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

### 2. The Title VII Context

■■ This case is governed by the dictates of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court constructed the widely known legal framework for analysis of employment discrimination claims that are supported by circumstantial evidence of discriminatory intent. That test imposes upon the plaintiff the initial burden of establishing a *prima facie* case of discrimination. Plaintiff's satisfaction of the initial burden creates a weak inference of discrimination. *See* FED. R.EVID. 301. The burden then shifts to the defendant, who is constrained to produce evidence that the employment decision was motivated by legitimate, non-discriminatory reasons ("LNR"). The presumption created by plaintiff's *prima facie* case then drops out of the litigation; plaintiff bears the ultimate burden of persuasion that defendant's proffered LNR is a mere pretext for discrimination. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——–——, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993).

■■ This circuit has frequently applied the foregoing general summary judgment rules, *see Anderson* and *Celotex,* within the context of Title VII's analytical framework. *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Although "nebulous questions of motivation and intent" often makes summary judgment inappropriate for disposition of employment discrimination claims, *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595 (11th Cir.1987), "[s]ummary judgments for defendants are not rare in employment discrimination cases." *Earley v. Champion Internat'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). A plaintiff's successful construction of a *prima facie* case "does not in and of itself foreclose the possibility of summary judgment being granted in favor of the employer." *Young,* 840 F.2d at 828; *Grigsby,* 821 F.2d at 595 (citing *Pace v. Southern Ry. Sys.,*

701 F.2d 1383, 1389 (11th Cir.), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983)). The quantity and quality of evidence required for a defendant to succeed on summary judgment is, of course, a function of the strength of plaintiff's case:

> In some cases, the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiff's prima facie case. * * * Of course, even in the face of such strong justification evidence, a plaintiff might still create an issue of fact and avoid summary judgment by introducing additional evidence of pretext. But a plaintiff may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant.

*Grigsby,* 821 F.2d at 596. *See also, e.g., Coutu v. Martin Cty. Bd. of County Comm'rs,* 47 F.3d 1068, 1073–74 (11th Cir. 1995) (summary judgment for defendant proper where national origin discrimination plaintiff failed to adduce evidence sufficient to raise an inference of pretext); *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 949–50 (11th Cir.1991) (district court properly awarded defendant summary judgment on plaintiff's § 1981 race discrimination claim where circumstantial evidence was "not sufficiently probative to create an issue of fact on the pretext issue"), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992); *Earley v. Champion Internat'l Corp.,* 907 F.2d 1077, 1080–81 (11th Cir.1990) ("Summary judgments for defendants are not rare in employment discrimination cases"); *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988) (evidence not "sufficiently probative of pretext to withstand a motion for summary judgment"), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595–96 (11th Cir.1987).

■ Cases subsequent to *Grigsby* make it clear that only "significantly probative" evidence, *see Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11, will create the requisite issue of fact regarding pretext. *Brown; Young.*

## B. Plaintiff's Prima Facie Case

### 1. Escort Duties

■ In the case *sub judice,* plaintiff is not alleging the typical failure to hire or failure to promote claim; rather, plaintiff simply complains that he was accorded different treatment than his white co-workers on account of race. The *prima facie* case therefore will differ somewhat. Plaintiff is required to show in this situation that he (1) belongs to a protected group, and (2) was treated differently from similarly situated individuals who are not members of the protected group. *Potter v. Goodwill Indus.,* 518 F.2d 864, 865 (6th Cir.1975). The first category is readily met—plaintiff's race is black, a protected category for Title VII purposes. The question is whether plaintiff has by means of "significantly probative evidence" shown that he was treated differently from white co-workers. *Cf. Earley,* 907 F.2d at 1083 (applying "significantly probative" standard to plaintiff's prima facie element under ADEA).

■ Defendant claims that plaintiff has not shown that he was accorded treatment different from that received by white co-workers in regard to escort duties. Plaintiff counters that the rotation system was not fairly applied, as is evidenced by the fact that he had more total hours, and that Hostutler (WM) received credit although he was never required to serve as an escort. For the following reasons, the court concludes that plaintiff has not made out a prima facie case.

■ The court does not believe that the purpose of Title VII was to force employers to divide tasks among employees so that each served the same time on undesirable assignments—to the day, hour, minute, and second. Reneman implemented the best system available to him, and attempted to stick to it. That some disparity occurred is to be expected. With only four participants in the rotation, it was very likely under the circumstances that someone would "get the call" out of turn every so often. Even so, a four-hour differential between plaintiff and the next closest white male with respect to time served on escort duty, considering that the

four hour difference was a three-month accumulation of escort assignments, does not in the court's considered judgment constitute "significantly probative" evidence that plaintiff was treated differently from similarly situated white males. The court finds that plaintiff was treated identically for purposes of participating in the rotation system used to dole out escort assignments.[4] To the extent that Hostutler (WM) received preferential treatment, no evidence of discriminatory treatment has been shown: Hostutler and plaintiff were not "similarly situated". Hostutler had back problems, plaintiff did not.

### 2. Reprisal by Lowered Appraisal

■ Plaintiff also contends that his EEO activities caused Reneman to retaliate against him through his annual appraisal. Specifically, plaintiff says Reneman told him his marks in "working relationships" and "communication" would be higher if he'd just stop filing complaints. To make out a *prima facie* retaliation claim, a plaintiff must show that he (1) engaged in protected opposition to Title VII discrimination; (2) was adversely affected by an employment decision simultaneously with or subsequent to such opposition; and (3) there was a causal link between the protected opposition and the adverse employment action. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989).

■ Plaintiff has similarly failed, in the court's judgment, to make out a *prima facie* showing on retaliation. Overall, plaintiff's appraisals had not changed *at all* in the past four or five years. Being lowered one point in each of two categories is not "significantly probative" of an adverse employment action, especially when he is simultaneously raised two points in a third. Plaintiff's past appraisals were obviously indicative of his abilities: reviewers and raters were changed frequently to ensure fairness, and indeed plaintiff had never complained of a rating before. Without more, plaintiff has not shown that

this was an adverse employment action since his rating stayed the same as for the past several years. *See* Defendant's Reply Brief, at 7 (table comparison of plaintiff's past 5 appraisals).

Even if plaintiff did succeed in proving his review to be retaliatory (an adverse employment action), he has still failed to show that there was a causal link between the two lowered ratings and the protected activity. Many co-workers, white and black alike, deposed that they had difficulty working with plaintiff.

### C. Defendant's Legitimate Nondiscriminatory Reason

■ Assuming *arguendo* that plaintiff has proven a *prima facie* case on both claims, defendant is nevertheless entitled to summary judgment because of the overwhelming strength of defendant's evidence of a legitimate nondiscriminatory reason. *Grigsby,* 821 F.2d at 596; *Young,* 840 F.2d at 828–29.

### 1. Escort Duties

Defendant has adduced a wealth of evidence that the rotation system was applied as fairly as possible, and that any resulting disparity in hours was due to luck of the draw. Reneman testified that he did not single plaintiff out for disparate treatment. Reneman also deposed that he had no control over the number of hours a visitor remained, and that he had no choice but to send an available worker to escort duty when called upon to do so.

In fact, plaintiff's white coworkers could conceivably complain that *they were discriminated against* because plaintiff was called upon to serve escort duty with less frequency. Who is to say, truly, whether serving escort duty on four different occasions (as plaintiff did) is worse than serving on six different occasions (as Hodge did), even if under the former a few more hours are

---

**4.** Very convincing to the court is plaintiff's tacit admission that a rotation system had been implemented, although at times its application was necessarily *ad hoc* due to the sporadic need for escorts. When pressed for the source of his knowledge that a particular rotation entry had

been falsified, plaintiff responded that it was simply not possible for a person to be assigned to escort duty two days in a row, and that he had in fact never been assigned two days in a row. (Worthy, at 33).

accumulated? Defendant's evidence regarding the rotation system clearly demonstrated that it was applied evenhandedly without regard to race.

To conclude on this point: defendant offered a legitimate nondiscriminatory reason for the insignificant disparity in escort duty hours. The strength of the evidence in favor thereof substantially outweighed, "bowled over" in fact, plaintiff's prima facie case.

### 2. Reprisal by Lowered Appraisal

Similarly, defendant's evidence with respect to his appraisal—that appraisals were conducted by various raters and reviewers; that both black and white coworkers had difficulty working with plaintiff (hence the lowered score on "working relationships"); that plaintiff obtained the same score for three years in the "communications" category prior to the events complained of; that plaintiff never complained of low scores before; and that plaintiff produced no evidence that his scores should have been higher—is overwhelming in comparison to that put on by plaintiff in support of his prima facie case. As the court said in *Grigsby,* the plaintiff cannot simply rely upon the laurels of his prima facie case; rather, he must adduce "significantly probative" evidence of pretext to create a question of fact sufficient for the jury. Plaintiff has wholly failed to do that here.

### III. CONCLUSION

The undisputed facts available to the court, when coupled with the overwhelmingly powerful evidence by defendant of a legitimate nondiscriminatory reason, and a dearth of any evidence from plaintiff, forces the conclusion that summary judgment is appropriate for defendants.

**DEFENDANT'S MOTION IS GRANTED. LET JUDGMENT BE ENTERED FOR DEFENDANT.**

**SO ORDERED.**