**KVAERNER U.S., INC., Brown Machine Division of Kvaerner U.S., Incorporated, Plaintiff,**

v.

**HAKIM PLAST COMPANY, Defendant.**

No. 96–70059.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 18, 1999.

Marilyn A. Peters, Joseph H. Hickey, Bloomfield Hills, MI, for plaintiff.

Lawrence S. Charfoos, Atallah T. Taweel, Detroit, MI, for defendant.

## OPINION AND ORDER[1]

TARNOW, District Judge.

### Introduction

Brown Machine Company, a division of Kvaerner U.S. Inc. ("Brown"), entered into a contract to supply a machine and tools to Hakim Plast (Hakim), a food container producing company based in Cairo, Egypt, to enable Hakim to meet its growing demand for plastic containers. The plastic containers were for customers to use in the ice cream distribution industry. It was understood that the equipment would be ready for delivery before the busy summer ice cream season.

Brown Machine was not able to meet the twice extended deadline. Brown attempted to obtain another extension, but Hakim Plast refused without additional consideration. Brown refused to provide the requested consideration. Hakim Plast declared the contract breached on September

25, 1994. Brown then sold the equipment. Brown brought suit for breach of contract requesting damages for the loss of the sale. Hakim Plast counter sued for Brown's breach seeking out of pocket expenses and consequential damages for loss of business.

The issue for this Court is who breached the contract of sale between these two merchants. To make that determination it is necessary to determine the terms of the contract. Especially important is the delivery date. The Court determines that the contract delivery date originally was 25–27 weeks from when the contract was formed on November 1, 1993. This date was extended twice by the parties, which resulted in a final delivery date of September 25, 1994. The equipment was not ready for delivery as of that date.

The final question concerning liability is who was at fault for this delay. The Court determines the fault was that of Brown Machine, who was unable to meet the requirements of the contract to produce the containers to match the samples provided by Hakim Plast. Therefore, Brown Machine's claim for damages fails.

Hakim Plast is entitled to their out of pocket expenses as a measure of damages. In addition, Hakim Plast would be entitled to consequential damages, because it has shown the limitation on consequential damages in the original contract, while valid, when written, has been waived by the second extension of delivery date. However, the fact it was unable to prove what business was lost means the award of damages for a loss of business component would be too speculative.

The Court has reached these conclusions based on the following findings of fact and law.

### Jurisdiction

This is an action in diversity. Plaintiff is a Michigan corporation. Defendant is a foreign corporation with its principal place of business in Cairo, Egypt. The amount

---

1. Law Clerk Philip M. Cavanagh provided quality research assistance.

in controversy exceeds $75,000. Jurisdiction is proper under 28 U.S.C. § 1332.

■ An action predicated on diversity utilizes the law of the state in which the federal court is located. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that this dispute is to be settled under Michigan law.

Further, this transaction is one between merchants. Therefore, any Agreement is governed by Article 2 of the Uniform Commercial Code, since it involves a contract for the sale of goods. U.C.C. § 2–102; M.C.L.A. § 440.2102, M.S.A. § 19.2102.

### Background

### *Negotiations, Offer and Pertinent Terms of the Proposal*

Plaintiff/Counter–Defendant Brown Machine is located in Beaverton, Michigan. Brown is in the business of designing and manufacturing thermoforming equipment, trim presses, molds and related tooling. Defendant/Counter–Plaintiff Hakim Plast Company manufactures and sells food product containers.

From May 1993 through September of 1993, Brown and Hakim negotiated the purchase and sale of Brown equipment, including a thermoformer, trim press and molds.[2] Negotiations were between Mr. Richard Stewart, the President of Brown, and Mr. Mohamed Hakim, the President of Hakim Plast. In the course of those negotiations, Brown submitted a series of proposals, which were responded to by Hakim for various types of equipment and tooling. The parties met. Hakim viewed Brown's plant and Brown's equipment in operation at a Brown customer's facility. The parties undertook a series of discussions. Hakim advised Brown that it would be purchasing the tooling for round containers from Future Mold, a competitor of Brown. It requested that Brown agree that Future Mold could test its tooling on Brown's machines. Brown agreed.

Hakim and Brown eventually agreed that Hakim would purchase one thermoformer, one trim press and four sets of tooling for square and rectangular rigid plastic containers, and snap on lids. On September 17, 1993, Brown submitted its final proposal dated as of September 16, 1993 for the sale of a Model CS–4500 Thermoformer, one T–300 Trim Press and four molds (the "equipment"), together with agreed upon terms and conditions (the "proposal"). The proposal contained specifications, estimated cost, an estimated delivery and terms and conditions which would govern the sale. The proposal provided that Hakim would pay $687,551.00 for the equipment.

The equipment was needed by Hakim so that it could supply its customers in Cairo with various sizes of containers for ice cream. The shape and sizes of these containers were standard in Egypt. Hakim supplied Brown with samples of the various containers in order to duplicate the shape and size of each container, and their respective lids. Approved product drawings of the square and rectangular containers and lids (the "products") were necessary in order that the tooling could be designed. Those product drawings were to be generated from the samples, and were to be approved by Hakim. The product drawings would then form the basis of the tooling design.

Under the heading "Delivery", the proposal provided an estimated delivery date of "Approximately 25 to 27 weeks, testing of tools inclusive, to be confirmed upon notification by Chase Manhattan Bank, N.A.('Chase') that Hakim had opened a confirmed and irrevocable Letter of Credit in Brown's favor." It further stated that "Delivery contingent upon expedient approval by Hakim Plast Co. of Tooling product drawings." Delivery was said to occur when Brown delivered either to Hakim or to a common carrier. The pro-

**2.** Molds are also known as tooling.

posal provided a six month warranty for the equipment and parts.

The proposal constituted an offer which remained open through October 16, 1993. At Hakim's request, Brown later extended this date through October 31, 1993.

### *Acceptance*

The proposal dated September 16, 1993 was never signed by Hakim. The proposal specifically stated that any agreement was predicated on the issuance of a Letter of Credit by Chase Bank. Hakim was to obtain the funding for this equipment through U.S. AID.[3] The proposal made reference to the Letter of Credit, and U.S. AID documents required reference to the Letter of Credit and other related documents of the transaction.

On October 5, 1993 Mr. Mohamed Hakim, the company president, faxed to Brown Machine a notification that:

The Letter of Credit would be send [sic] soon in few days but our bank agreed only to open the Letter of Credit with an expiry date 6 months from the Letter of Credit date. That mains [sic] that you must ship the machine before 6 months and any help you will need and we can offer to prevent any lateness we will not hesitate to do it.

This fax also specified in capital letters:

PLEASE SEND TO U.S. THAT YOU ASSENT THIS [sic] TERMS SOON.

■ The September 16, 1993 proposal required a Letter of Credit to be opened for 36 months. A Letter of Credit with an expiry date of 6 months was a material change in the terms of the proposal and constituted a counteroffer.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, un-

less acceptance is expressly made conditional on assent to the additional or different terms.

M.C.L.A. § 440.2207(1), M.S.A. § 19.2207(1).

Even if the change in the duration of the Letter of Credit could be construed as just an additional term, Mr. Hakim expressly made acceptance conditional on assent to the additional or different term.

The next communication from Hakim came on October 19, 1993. Mr. Hakim sent a telex requesting that Brown "extend the validity of your proposal." By that date, the proposal had expired. By facsimile dated October 19, 1993, Mr. Richard Stewart of Brown advised Mr. Hakim that Brown agreed to extend the validity of the proposal to October 31, 1993.

On October 27, 1993 a Letter of Credit was issued by Chase Manhattan Bank in New York in the amount of $687,551.00 "in accordance to the September 16, 1993 proposal." The Letter of Credit also noted that the latest shipment date was April 15, 1994. This was received by Brown the next day. Mr. Stewart testified that Brown started work immediately upon receipt of the Letter of Credit. A work order dated November 1, 1993 was issued November 11, 1993. Product drawings were made pursuant to this work order from the samples Brown had received from Hakim. These drawings were sent to Mr. Mohamed Hakim on November 16, 1993.

M.C.L.A. § 440.2207, M.S.A. § 19.2207 provides:

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, togeth-

---

**3.** U.S. AID provides money from the U.S. Government to certain nations, for grants and favorable loans to companies in those nations to buy U.S. products. U.S. AID reimburses the bank which pays for the products under a Letter of Credit.

er with any supplementary terms incorporated under any other provisions of this act.

■ When Brown received the Letter of Credit and began work, its conduct constituted acceptance, and a contract was formed. Notification of this acceptance was evidenced by the product drawings sent to Hakim. The parties as of November 1, 1993 were thereafter obligated to act reasonably and in good faith in pursuit of the timely completion of their agreement.

■ Assent to an offer may be indicated through actions. *Pakideh v. Franklin Commercial Mortgage Group*, 213 Mich.App. 636, 641, 540 N.W.2d 777 (1995). If an offer suggests a permitted mode of acceptance, other methods of acceptance are not precluded. *Allied Steel & Conveyors v. Ford Motor Co.*, 277 F.2d 907, 910–911 (6th Cir.1960). One such manner of acceptance occurs when the offeree tenders performance. *Id.* To create a contract under such circumstances, the individual to whom the offer is extended must manifest an intent to be bound by the offer, through voluntarily undertaking unequivocal acts sufficient for the purpose. *Wilkinson v. Lanterman*, 314 Mich. 568, 573, 22 N.W.2d 827 (1946).

Moreover, the timing and responsiveness of a party's writings and conduct are dispositive factors in determining if or when a contract is formed. *Challenge Machinery Co. v. Mattison Machine Works*, 138 Mich.App. 15, 359 N.W.2d 232 (1984). The Uniform Commercial Code provides in relevant part that a contract may be made "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–204; M.C.L.A. § 440.2204, M.S.A. § 19.2204.

The contract formed between Brown and Hakim Plast included the terms and conditions in both the proposal and the Letter of Credit[4]. Each document was

essential to interpret the other. Further, the correspondence and conduct of both parties show that they intended to be bound by the terms and conditions of both documents.

### Delays

Brown's initial product drawings dated November 11, 1993 were forwarded to Hakim Plast on November 16, 1993. Throughout November and December of 1993, Brown and Hakim discussed various changes to the design drawings. The exchange of drawings and willingness to proceed further evidences that a contract had been formed.

This was a sale by sample. Hakim required machinery that could duplicate the samples. James Robbins, then Director of Tooling for Brown, testified that Hakim demanded that the containers be able to nest, or stack one container on the below container's lid. Brown argued that this new demand was a partial reason that the drawings took nearly two months to develop to Hakim's liking. Yet the Court must note that the samples given to Brown, Exhibits 160(a) thru (g), do nest and the lids snap securely.

Another concern of Hakim's was that the lids would attach securely. This concern proved to be a problem throughout testing to the end, nine months later.

On January 3, 1994, Brown sent Hakim another set of revised product drawings. On January 6, 1994, Hakim gave its final acceptance of the product drawings. In that fax, Mohamed Hakim stated "we hope that you would be able to handle [sic] out the machines and the molds before the end of Letter of Credit so that we would be able to give you another order". The expiration of the Letter of Credit at that time was April 15, 1994. Hakim had expectations of a continuing business relationship with Brown.

4. These terms were later modified through correspondence and acts of the parties.

On February 2, 1994 Brown's controller, Donald Kvorka, wrote to Mr. Hakim stating that due to a variety of circumstances, which included there were just too many orders from other Brown customers, all delivery dates must be extended. Mr. Kvorka requested that the Letter of Credit be extended to allow for an expiration date of July 31, 1994. This was a request to extend the delivery date another 13 weeks.

Shortly thereafter, Mr. Ken Braney, a sales representative for Brown, visited Hakim's plant in mid-February. Braney communicated to Mr. Stewart that Hakim Plast was hoping to have the equipment in its plant for its summer season in 1994 (May through September), to try to recoup some of the costs. Mr. Braney also indicated that Hakim was interested in buying more equipment from Brown. He requested that Brown try to improve delivery, to make Hakim happy. Mr. Braney also explained that the containers were to be sold to ice cream producers. It was obvious delivering in time for the summer ice cream season was imperative.

On March 25, 1994, after conferring with Future Mold, Mr. Stewart sent a facsimile to Hakim in response to Mr. Braney's previous requests. It stated that Brown's machinery and tooling would be available for testing on April 25th, May 9th and May 23rd. With regard to the Future Mold tooling, Brown noted that the final Future Mold tools would be available for testing on Brown's machine on June 10, 1994.

In order to get the equipment into production as soon as possible, and during the summer season, Brown proposed a bifurcated delivery schedule. Brown would ship the Brown thermoformer and trim press upon completion of testing in April of 1994 and then the molds as completed in April and May (Brown), and June (Future Mold) of 1994.

On April 5, 1994, Hakim rejected that proposal. Hakim stated it preferred to stay with the arrangement whereby all tooling would be tested all at once at Brown before shipment. Hakim further agreed to the extension of the Letter of Credit to the end of July, as long as Brown and Future Mold paid the bank for the extension.

On April 11, 1994, Mr. Kvorka wrote to Mr. Hakim:

> Based upon our current estimate of when the machine and tools will be ready to ship please extend the Letter of Credit to a *shipment date of July 31.* This will allow us plenty of time to thoroughly try out the machine and all the tools—both ours and Future Mold's. We expect to be ready several weeks before that date, but to avoid any further [sic] Letter of Credit amendments it is advisable [sic] to add a couple extra weeks. [emphasis in original].

Mr. Hakim testified that he was very displeased with the delay in the delivery schedule. He agreed to the extension of the Letter of Credit reasoning that his only alternative was to seek another manufacturer and restart the entire process. Relying on the above underlined guarantee, Mr. Hakim on April 24, 1994 [5] agreed to the extension of the Letter of Credit. He stated, "We are not please [sic] to have this long period and if any farther extension will be required we are afraid that we have to incharge [sic] you the cost of our loss." Hakim extended the Letter of Credit to shipment and expiration dates of July 27, 1994. Brown paid the cost of the extension of the Letter of Credit.

In May of 1994, Brown ordered and purchased plastics and other materials to test the equipment. Mohamed Hakim's brother, Diaa Hakim, an employee and officer of Hakim Plast, came to Brown's factory in June of 1994 prepared to view testing and approve shipment of the equip-

---

**5.** This date was after the original Letter of Credit had expired. Hakim was under no obligation to extend the Letter of Credit be-

cause Brown, as of this date, was in material breach.

ment. It is undisputed that when Diaa Hakim arrived, the equipment was not ready. There was nothing for him to do.

 When the first testing was performed, the equipment did not work properly. Brown claims that Diaa Hakim was much too demanding and made requests beyond what was called for by the contract. Diaa Hakim, and later Mohamed Hakim, testified that they just wanted the lids to fit securely on the container. There were changes made throughout the summer of 1994 in an effort to get the lids to snap onto the containers. As this was a sale by sample, this request was within the scope of the contract.

Testing was scheduled to take 6 to 8 weeks. Diaa Hakim arrived in early June, 1994 to witness the testing. He had hoped he could approve the equipment so that it could be shipped prior to the July 27, 1994 expiry date of the Letter of Credit. Testing did not begin until July. It soon became clear that the equipment was not ready to be shipped. There were several machine 'Modification Requests' submitted internally at Brown. These were dated August 5, 11, and 25, and September 9 and 12, 1994. The requests further show the unavailability of finished equipment.

On August 3, 1994, Donald Kvorka of Brown, sent two letters to Hakim requesting a second extension of the Letter of Credit[6]. One was for Hakim's bank, while the other was for Hakim. Brown requested an extension to October 20, 1994. Mohamed Hakim testified that he was "shocked" and very upset by this second such request. He came to the United States to see first hand what were the problems. He arrived in mid-August. He said that in the five days he was at Brown[7], not a single test was successful.

Mohamed Hakim returned to Cairo, but instructed Diaa Hakim to stay and continue monitoring the testing.

Mohamed Hakim once again felt that too much time had passed. However, he was forced to agree to the delay, otherwise he would have to begin anew. Hakim extended the Letter of Credit to October 5, 1994. The new shipment date of September 25, 1994 meant that the equipment had to arrive in New York on September 25 to comply with the Letter of Credit, which was issued August 25, 1994. Brown paid Hakim's bank for this second extension.

Diaa Hakim was at Brown throughout June, July, August and September, 1994. He testified that he was at Brown's Beaverton plant nearly everyday during that summer. When he arrived in early June, neither the Trim machine nor any of the Brown molds were made. He stated the machinery was mostly assembled the third week of July. Because of the incompleteness of the machines, he had to go to Detroit to extend his travel documents. Diaa Hakim testified that no matter what adjustments Brown would make, the lids would not snap onto the containers. This characteristic was essential. It was a material defect that had to be remedied before Hakim Plast could produce and sell the containers to its customers.

As the machinery and tools became available, they would be tested. This testing continued until Friday, September 23, 1994. On this date, Brown claimed that Diaa Hakim expressed satisfaction with the test, and all involved in that day's testing went to a local bar to celebrate.[8] Even though the equipment was not in New York or enroute to Cairo, as commanded by the Letter of Credit, Brown

6. Once again, this date is after the shipment date required by the Letter of Credit.

7. Mr. Stewart testified at trial that Mohamed Hakim never visited the plant, at any time. Mohamed Hakim's visit was later confirmed by the testimony of Mr. Robbins.

8. Yet there was testimony by Diaa Hakim, Stewart and Robbins that because Diaa Hakim was at the plant daily for so long, he became good friends with the Brown employees. It was not out of the ordinary for the parties involved to go to the tavern after a successful day of testing.

argued that this constituted approval of the entire project. Brown pointed to this celebration for the assertion that there could not have been a material breach, because the machinery was ready to be shipped.

Diaa Hakim testified that it was on this date that he lost hope that the equipment would be completed on time. The Letter of Credit dictated shipment within two days. There were many tools not yet ready. He decided to return home.

Brown claimed that Diaa Hakim's departure that previous weekend caught them completely by surprise on Monday, September 26, 1994. Brown stated that they had tests scheduled for that day[9], which could not commence without Diaa Hakim's presence. It wasn't until they contacted Diaa Hakim in Egypt that Brown realized he had left.

On September 29, 1994, Diaa Hakim told Robbins that Mohamed Hakim refused to extend the Letter of Credit again unless Brown would provide consideration by agreeing to issue assurances of delivery. Hakim insisted on a 10% Letter of Guaranty assuring Hakim that Brown would meet the next shipment date or the contract would be reduced by 10%. Hakim also insisted upon a one year warranty on the equipment instead of the six months under the proposal. In viewing all the problems and delays involved with this project, these requests were not unreasonable.

Brown felt that these requests constituted extortion. Brown refused the demands. Hakim refused to further extend the Letter of Credit. Brown subsequently sold the machinery for a $242,000 loss. Brown filed suit on January 4, 1996 to collect that loss.

## Analysis

There is no question that Brown was not prepared to deliver the specially-made machinery until at the earliest the end of September 1994. Although Brown argues that the terminology "estimated", "approximately", and "conditioned upon" in the proposal allowed leeway, they also acknowledge that they were not prepared to deliver the machinery until September 23, 1994[10]. Five extra months in a contract contemplated to be accomplished within six months constitutes a material breach of contract. Although Mr. Hakim did object to the delays, he also did extend the Letter of Credit twice, yet always at Brown's request and expense.

Brown argued that the September 16, 1993 proposal, coupled with Hakim's acceptance on January 4, 1994[11] of the product drawings, constitute the contract. Brown argues that the issuance of the Letter of Credit is simply Hakim's acceptance to the proposal of September 16, 1993. Brown conceded though, in deposition testimony and during trial, that the Letter of Credit controlled the method by which they were to receive payment. Brown would not have engaged in any contract with a foreign corporation without the assurance of the Letter of Credit. Brown was well aware that the Letter of Credit had an "expiry" by which they were obligated to produce the completed and tested machinery to a common carrier to receive payment. The central focus of not only negotiations, but also, continuance of production and acknowledged delivery deadline was the Letter of Credit.

Brown argued that the proposal itself was the contract. The proposal said that the delivery schedule was approximate. The proposal submitted by Brown to Hak-

9. Once again, this is after the shipment date that Brown acknowledged controlled payment.

10. Brown admits that many of the delays were their fault. However, Brown argues that the additional demands placed on them

by Hakim Plast were the majority of the causes for delay.

11. Even taking this date as the beginning of the 25–27 approximated delivery schedule, the equipment still was not completed (38 weeks) later.

im does state that approximate time for delivery is 25 to 27 weeks. Taking this argument to its logical extreme, Brown would never be obligated to deliver the machine because the word approximate was used. The obligation came with the Letter of Credit. The Letter of Credit set a firm delivery schedule, which was reasonable.

It was further argued by Brown that they were never informed by Hakim that the containers were needed for the summer season. However, Brown was on notice of Hakim's scheduling demands. In a telefax dated February 19, 1994 generated from Cairo by Ken Barney, Brown's sales agent, to Richard Stewart, he stated: "Both brothers are very concerned about deliveries from Future Mold and Brown." Mr. Barney further informed Brown's executives:

> There [sic] problem is that they planned to have the equipment running for the summer season. May till Sept., When they are at their busiest and expected to gain market share [sic] and therefore recoup some of the costs. Each month lost means, lost money. They say if at latest arriving in June, they can still produce by the end of the season. Your friends Mohamed Hakim, Samy and the older brother are *relying* on you to help them, as they promise more machines are to be ordered in early '95. One new extender and two thermoformers. [emphasis in original].

Brown knew with certainty that if they failed to ship the equipment by the expiry date on the most recent Letter of Credit, Brown would not be paid. This was acknowledged by Mr. Stewart when asked on cross exam:

Q: Did you agree to be bound by the terms of the Letter of Credit?

A: Yes. We agreed to the terms of the Letter of Credit.

In deposition testimony, Mr. Stewart was asked what would happen if Brown failed to ship by the expiry date of the Letter of Credit. His response was "then I'm afraid that we would have a machine on our hands".

Mr. Kvorka, controller for Brown, also acknowledged at trial that "Brown took a business risk of not getting paid, if you don't follow the Letter of Credit".

■ Hakim, at the request of Brown, extended the Letter of Credit twice even though they were not required to do so. Contracts may be modified by agreement of the parties and such modifications are binding—even without consideration. U.C.C. § 2–609; M.C.L.A. § 440.2209, M.S.A. § 19.2209. The prevailing test, as is with the entire U.C.C., is good faith. The test of "good faith" between merchants includes "observance of reasonable commercial standards of fair dealing in the trade" (Section 2–103), and may in some situations require an objectively demonstrable reason for seeking a modification. *See Comment*, M.C.L.A. § 440.2209, M.S.A. § 19.2209. These Letter of Credit extension modifications became part of the contract by reason of waiver, acquiesce and course of performance.

M.C.L.A. § 440.2208(1), M.S.A. § 19.2204(1) allows:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

■ A waiver occurs when a party " 'with full knowledge of material facts, does or forbears to do something inconsistent with the existence of the right in question or his intention to rely on that right.' " *Fitzgerald v. Hubert Herman*, 23 Mich.App. 716, 718, 179 N.W.2d 252 (1970) (quoting 31 C.J.S., Estoppel, § 67, p. 402). A party's affirmative conduct or statements which indicate that performance is not required constitute a waiver of the

breach. *Id.* Hakim not only acquiesced to the delays by Brown through May, June and July of 1994, it waived any right to receive damages caused by the delays because of the first Letter of Credit extension.

Mohamed Hakim reluctantly agreed to an extension of the first Letter of Credit expiry date of April 15, 1994 based completely on Mr. Kvorka's *promise* that a *shipment date of July 31* "will allow plenty of time to thoroughly test the machine and tools—both ours and Future Mold's." This guarantee came after Brown executives had conferred with Future Mold and decided upon the latest date needed for completion of the equipment. Hakim relied on this promise given by Mr. Kvorka on April 11, 1994 when he had the Letter of Credit extended to July 27, 1994; but Mohamed Hakim warned that "if any farther extension will be required we are afraid that we have to incharge [sic] you the cost of our loss."

 The intent of the message is clear. Brown was already on notice as of February 19, 1994 that Hakim needed the equipment because it had commitments to its customers for the summer. Now, four days before the equipment was to be completed, Hakim was being forced to wait another three and a half months. On April 24, 1994, when Hakim did not exercise his right to hold Brown in breach of their contract, it was in the contemplation and understanding of both sides that the equipment would be delivered before the end of July. If this did not happen, Hakim would be compensated for its losses—both out of pocket and consequential damages. This modification, or consideration for a second extension of the Letter of Credit, would not attach to the contract as an additional term unless Brown requested,

and Hakim granted, a second extension. But when both those conditions occurred on August 3 and August 25, 1994, respectively, Brown agreed by its actions to pay Hakim for its losses.

 As noted, Brown paid the bank for the extensions. However, as to the expiry date of the last Letter of Credit, when the equipment was not shipped on September 25, 1994, Hakim was under no obligation to further waive its rights, or accept any further delays. This is true, if Hakim on that date was acting in good faith, and within reasonable commercial dealings within the trade. There was sufficient evidence to show that Hakim was quite reasonable in not allowing further extensions.

Mohamed Hakim testified that when he realized that his company would qualify for U.S. AID assistance, he received three other offers from three other United States manufacturing companies. Hakim decided to go with Brown Machinery mainly for two reasons. First, Brown presented to it that Brown could design and manufacture the necessary equipment from samples. Second, Brown stated that they could have such equipment to Hakim within six months. Both assertions proved false.

Brown originally presented their case asserting that Hakim was attempting to extort a lower price and a longer warranty on the eve of delivery. The undisputed evidence sets forth that Brown represented to Hakim that it could manufacture machinery that could produce containers 15,000 containers per hour[12], and that Brown could do it in "approximately 25–27 weeks." Because of delays not attributable to Hakim, Hakim lost the entire summer season. Its image was tarnished with all of their customers which it had secured orders.[13]

---

12. 38,000 pieces an hour if one were to include Future Mold's tooling.

13. Brown attempted to impeach Hakim on this issue at trial arguing that Hakim did not produce any customer lists showing lost sales. The Court notes that most companies do not order $700,000 machinery without the demand for its utilization. Mohamed Hakim testified that business in Cairo at that time, and since, was very, very good. He knew then, and has since sold everything he makes.

 Hakim had lost enough due to the delays. A 10% Letter of Guaranty would have been commercially reasonable.[14] Mohamed Hakim testified that Hakim had to put up 10% of the loan to receive the Letter of Credit. When the Letter of Credit was forfeited, Hakim lost 80% of that deposit. Further, because of all the problems with the equipment, a full year's warranty cannot be said to be commercially unreasonable within the trade, especially considering that Brown did give a one year warranty to the company that eventually purchased the equipment.

The Court finds further convincing evidence of failure to produce by Brown to be the lack of evidence of any containers produced by the machine testing. Brown testified that tests were complete and the equipment was ready for delivery when Diaa Hakim left to return home on September 25, 1994. Diaa Hakim stated that the machines were unable to produce adequate containers and accompanying lids for any extended period of time. Brown asserted that they never let the tests run for more than ten minutes, because the machines would generate too many test samples. Yet not a single sample could be produced for trial. Brown stated that it attempted before trial to secure some sample pieces from their storage or from potential customers, but they must have discarded them all. This was a sale by sample, and not a single sample of a successful production run could be found for trial, except those provided by Hakim. These were not produced by Brown, but rather the clones of the samples provided to Brown.

During the trial, Brown changed its theory from extortion by Hakim to Hakim realizing that it did not need such a large machine with such capacity. This assertion is equally unbelievable. Hakim Plast is a major company in Egypt. At the time

it had two factories employing over 500 people. Hakim now has three plants operating 24 hours a day, employing over 1,500 people and using over 100 machines. Hakim has ordered machines from manufacturers in Germany, Australia, Italy, Sweden and the United States without ever experiencing such problems. Mohamed Hakim testified that he had advance orders from his customers in Egypt that expected their containers. He testified that business was so good that Hakim could have easily sold all the product it could make. This is further evidenced by the documentation from January and February, 1994 that Hakim wanted to order more machines from Brown after this equipment was delivered. There is no logical business reason proven to not accept delivery of equipment, if it were operating properly.

On September 30, 1994, Brown Machine informed Hakim that the goods were complete and "Effective today we have stopped all work on this project until a resolution has been agreed upon." This statement was internally inconsistent. If the equipment were completed, there was no need to suspend further work.

[15] This Court finds that the equipment was not ready for shipment as Brown claims on September 25, 1994. Therefore, it was Brown Machinery Company that materially breached the contract.

## Conclusions of Law

### Brown's Claim

[16] It is well established under Michigan law that the party who commits the first substantial breach of contract cannot maintain an action against the other contracting party for failure to perform. *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich.

14. Brown testified that Hakim demanded a 10% reduction in the contract price. At this point in the project, such a request would not be unreasonable as consideration for a third Letter of Credit extension. The Hakim brothers stated that in European dealings, a 10% Letter of Guaranty to insure compliance with a delivery date is commonplace; even without three previous incidences of noncompliance.

77, 89, 36 N.W.2d 311 (1949). *See Kiff Contractors, Inc. v. Beeman*, 10 Mich.App. 207, 210, 159 N.W.2d 144 (1968) (*quoting Barton v. Gray*, 57 Mich. 622, 636, 24 N.W. 638 (1885) for the principle that "no one who causes or sanctions the breach of an agreement can recover damages for its nonperformance."). Because Brown committed the first substantial breach, it is not entitled to damages on its claims.

### Hakim Plast Counter–Claim

Hakim's counter-complaint requested consequential and reliance damages for Brown's breach of contract.

As stated by Justice Bradley in *United States v. Behan*, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168 (1884):

> The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely: first, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract. **The second item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires.**

110 U.S. at 344, 4 S.Ct. at 83. (Emphasis added).

### Out of Pocket Expenditures

DAMAGES BASED ON RELIANCE INTEREST

> As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, **including expenditures made in preparation for performance or in performance,** less any loss

that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

RESTATEMENT OF THE LAW, SECOND, CONTRACTS § 349 (Emphasis added).

> It is often very difficult to estimate the amount of profits that have been prevented by the breach of contract not only because of uncertainty in the happening of various contingencies, but also because of difficulty in determining the money value of a promised performance or the cost of completion by the plaintiff. There is usually little difficulty, however, in proving what has already been expended by the plaintiff prior to the date of the breach by way of preparation and part-performance. **The fact that profits are too uncertain for recovery does not prevent a judgment in favor of the plaintiff for the amount of his expenditures.**

CORBIN ON CONTRACTS, vol. 5, § 1031 (Emphasis added).

██ The Court does find that Hakim Plast should be reimbursed for its reliance damages. These damages include the 80% of the 10% down payment that Hakim Plast lost by forfeiting the Letter of Credit. This equals $55,004.08.

Also to be reimbursed are the travel and lodging expenses of Diaa Hakim over the summer of 1994, and the expenses incurred by Mohamed Hakim when he had to come to Beaverton in August 1994 to assess the delays. This figure was submitted to be $42,314.

Hakim's out of pocket reliance damages equals $97,318.08 plus interest. These expenses were reasonable, foreseeable and spent in good faith that Brown was going to deliver on time.

### Consequential Damages

Brown argues that the proposal clearly states that Brown may not be held liable for any damages allegedly caused by the delay:

SELLER shall not responsible for delay in delivery due to any cause beyond the SELLER's reasonable control including without limitation, acts of God, acts of Buyer, embargo, rescheduling due to priorities or other governmental acts, regulations or requests, fire, accident, strike, slow-down, war, riot, and delay in transportation, and in the event of such delay, the delivery schedule shall be extended for time lost by reason of delay. In no event shall SELLER be held responsible for loss of profits, damages, incurred by Buyer or its customers, or for consequential damages arising from any manner whatever.

proposal, p. 31, ¶ 6.

Hakim argued that if the proposal were part of the contract between the parties, which this Court finds to be true, the above language is still unenforceable because "under Michigan law the boilerplate exclusion of consequential damages would not be effective. *Krupp v. Honeywell*, 209 Mich.App. 104, 530 N.W.2d 146 (1995) requires a waiver of consequential damages to be in conspicuous language."

■ *Krupp* does not stand for the proposition as set forth by Hakim. *Krupp*, and the cases mentioned therein, deal with a waiver of implied warranties. Neither the U.C.C. nor Michigan law obligates a contract between merchants to set forth a disclaimer of consequential damages to be in conspicuous lettering. Therefore, the provision was enforceable when written.

In a fax dated April 24, 1994 Mohamed Hakim wrote to Brown stating: "We are not pleased to have this long period and if any farther extension will be required we are afraid that we have to incharge [sic]

you the cost of our loss." This fax was in response to Brown's first request for an extension of the Letter of Credit.

As previously discussed, the aforementioned quoted statement by Hakim is found to be a modification to the contract by which Brown's request for a second extension in July would be evidence of acquiescence to its terms.

The Court has found that the terms of the contract are found in the proposal and the original Letter of Credit. The Court further finds that the parties continuously modified the original contract and delivery date by their correspondence and actions to further extend the shipment dates. Hakim reluctantly agreed to the first extension and waived its right to sue for breach. Hakim made compensation for its losses a consideration for the second extension of the Letter of Credit to September 25, 1994. Brown knowingly negotiated away the written waiver of consequential damages in the proposal in consideration for a second extension in the Letter of Credit.

Restatement of Law, Second, Contracts § 352 provides: "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty".

■ Although Hakim Plast did set forth compelling and detailed testimony that their consequential damages were significant [15], this Court finds that to compensate Hakim for lost profits for one year would be too speculative a measure of damages. This Court cannot determine with 'reasonable certainty' that there would have been orders ample enough to sustain continuous production over the course of the year deemed attributable to

---

**15.** Mohamed Hakim testified that the machine theoretically should have been able to produce containers 24 hours a day. Hakim's lost profits for the six month delay by Brown and the six months needed to secure replacement equipment amounted to $360,000. He testified that this was a conservative estimate based on 8 hours a day for 300 days; meaning the machinery should have produced 15,000 containers per hour over an 8 hour period for 300 days at a profit of a penny per container. Mohamed Hakim's estimates, he claims, amount to at least $360,000 in lost profits directly attributable to the non-delivery of the Brown machine.

Brown's delay[16]. Further, there was no testimony as to what the break even point for production, nor that there were current container orders to reach that unknown point.

Therefore, although this court finds that Hakim is not the breaching party in this matter, Hakim's counter claim for consequential damages must fail.

### Interest

The rule prevails in Michigan that when necessary in order to arrive at fair compensation, the court or jury in the exercise of a sound discretion, may include interest or its equivalent as an element of damages, but interest is not to be separated from the damages allowed by the jury.... The question of interest allowable was for the [trier of fact].

*Grand Trunk Western R. Co. v. H.W. Nelson, Co.,* 116 F.2d 823, 838 (6th Cir.1941).

■■■■ In a diversity case, such as the one presently before the Court, federal law governs the rate of postjudgment interest. *See Bailey v. Chattem, Inc.,* 838 F.2d 149 (6th Cir.1988). However, "questions of prejudgment interest in diversity actions are to be determined under state law." *Diggs v. Pepsi–Cola Metropolitan Bottling Co., Inc.,* 861 F.2d 914, 924 (6th Cir.1988). Therefore, this Court must apply Michigan state substantive law in deciding whether or not to award plaintiff pre-judgment interest.

Michigan Compiled Laws Section 600.6013 provides that "interest shall be allowed on a money judgment recovered in a civil action," and governs the rate of interest to be applied after the filing of the complaint. M.C.L. § 600.6013(1).

The statute further provides that for complaints filed on or after January 1, 1987, if a judgment is rendered on a written instrument, interest shall be calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12% per year compounded annually, unless the instrument has a higher rate of interest. M.C.L. § 600.6013(5). The term "written instrument" encompasses written contracts. *See Yaldo v. North Pointe Ins. Co.,* 217 Mich.App. 617, 619–620, 552 N.W.2d 657, aff'd. 457 Mich. 341, 578 N.W.2d 274 (1998).

Hakim Plast was allowed to file its Counter–Complaint on June 5, 1998. Interest on the award of $97,318.08 shall be assessed at the rate of 12%, compounded annually, from June 5, 1998 until the satisfaction of the judgment.

With respect to interest potentially accruing before the filing of the complaint, federal courts applying Michigan law have recognized that "generally, Michigan courts have included interest as an element of damages as a matter of right where the amount claimed is liquidated." *Jones v. Lothamer,* 819 F.Supp. 1382, 1383 (W.D.Mich.1993) (*citing Banish v. City of Hamtramck,* 9 Mich.App. 381, 385, 157 N.W.2d 445 (1968)). A claim for damages is defined as being "liquidated" where, as in the case at bar, "the amount thereof is fixed, has been agreed upon, or is **capable of ascertainment by mathematical computation** or operation of law." *Robinson v. Loyola Foundation, Inc.,* 236 So.2d 154, 157 (Fla. App.1970) (citing cases). [emphasis added].

*Holland v. Earl G. Graves Publishing Co., Inc.,* 33 F.Supp.2d 581, 582–83 (E.D.Mich. 1998, J. Gadola).

■■■■ Michigan courts have determined that the appropriate pre-filing rate of interest is 5% per annum. *See Feiler v. Midway Sales, Inc.,* 363 Mich. 105, 108 N.W.2d 884 (1961); *see* also Jones, 819 F.Supp. at 1383 n. 1. This percentage is

---

**16.** Hakim did not purchase just one machine to replace the Brown equipment; but rather purchased several machines of lesser output capacity over the next few years. Hakim claims that it purchased replacement equipment from Adolf Illig, which was delivered on April 4, 1995. The production capacity of the Brown equipment, however, was 8 times that of the Illig machine.

determined by Michigan statute. See M.C.L. § 438.31.

Although, as discussed, Hakim's consequential damages may have been too speculative to ascertain by mathematical computation, the company's expenses incurred in reliance of Brown fully performing the contract on time were not. Therefore, as a matter of right, Hakim is entitled to 5% interest on its out of pocket expenses, $97,-318.08, from the date of the breach, September 25, 1994 until the filing of its Counter–Complaint, June 5, 1998.

It is so Ordered and Judgment is entered accordingly.