[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 13, 2004
THOMAS K. KAHN
CLERK

No. 03-13103

_____

D. C. Docket No. 99-00173-CV-RLV-4

BAYSHORE FORD TRUCK SALES, INC.
HEINTZELMAN'S TRUCK CENTER, INC., et al.,

Plaintiffs-Appellants,

versus

FORD MOTOR COMPANY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 13, 2004)

Before BARKETT and KRAVITCH, Circuit Judges, and FORRESTER*, District
Judge.

_____

*Honorable J. Owen Forrester, United States District Judge for the Northern District of
Georgia, sitting by designation.

FORRESTER, District Judge:

Bayshore Ford Truck Sales, Inc., Heintzelman's Truck Center, Inc., LJL Truck Center, Inc., Peach State Ford Truck Sales, Inc., and Valley Ford Truck Sales, Inc. (the "Dealers"), appeal from the district court's award of summary judgment to Ford Motor Company on a breach of contract claim. The Dealers also appeal an earlier order of the district court denying a motion to disqualify Ford's local counsel, the law firm of Sutherland Asbill & Brennan LLP.

The Dealers all became authorized Ford dealers between 1973 and 1987 by signing two franchise contracts with Ford, one to sell medium trucks and one to sell heavy duty trucks.[1] The Dealers competed amongst themselves, as well as other Ford and dealers of other brands, on a nationwide basis. In its sales system, Ford manufactured its truck platform, essentially a bare chassis, at a Kentucky plant; after delivery to a dealership, the trucks were subsequently modified and customized to suit the particular needs of their purchasers. Authorized dealers purchase these trucks from Ford at wholesale prices established by the company. Originally, these wholesale prices were published in bulletins distributed uniformly to all Ford dealers. In the early 1980s, however, Ford established a new

---

[1]The parties agree that the program in dispute applied equally to medium and heavy duty trucks. Accordingly, we will not distinguish between the two types of products and simply refer to "trucks" throughout this opinion.

pricing system for its trucks. In the new pricing system, Ford's stated wholesale prices were allegedly set at a level above market price. Ford also established a Competitive Price Assistance program ("CPA"), consisting in a two-part program to discount its wholesale prices. The first level of CPA, called Sales Advantage CPA, provided a standard reduction of the published wholesale price by means of a formula known to all dealers.[2] This first level of pricing assistance, published to the Dealers by Ford, allowed a dealer to calculate the "true" dealer cost of a truck. Ford's new pricing system also featured Appeal-Level CPA, a program that allowed individual dealers to appeal to Ford for a case-by-case reduction in wholesale price in addition to the price reductions secured by Sales Advantage CPA. In order to obtain this second price reduction, the dealer was required to provide Ford with specific information about the pending transaction at issue so that Ford could determine whether additional CPA benefits were warranted. Ford could then choose whether or not to grant the dealer's request for further reductions on wholesale pricing, sending its response to the dealer by facsimile.

---

[2]Originally Sales Advantage CPA was called Rainbow Schedule CPA, but there are no distinctions between the two CPA programs that are material to this case. Whether called Sales Advantage or Rainbow Schedule CPA, the Dealers do not allege that this particular facet of CPA breaches the franchise contract.

All Dealers participated in Ford's new pricing system, utilizing both Sales

Advantage and Appeal-Level CPA to sell trucks.

The dispute between the parties revolves around the terms of the Sales and

Service Agreements, Ford's standard contract with its medium and heavy-duty

truck dealers. Paragraph 10 of the Ford Truck and Heavy Duty Truck Sales and

Service Agreement reads as follows:[3]

> Sales of COMPANY PRODUCTS by the Company to the
> Dealer hereunder will be made in accordance with the prices, charges,
> discounts and other terms of sale set forth in price schedules or other
> notices published by the Company to the Dealer from time to time in
> accordance with the applicable HEAVY DUTY TRUCK TERMS OF
> SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF
> SALE BULLETIN. Except as otherwise specified in writing by the
> Company, such price, charges, discounts and terms of sale shall be
> those in effect, and delivery to the Dealer shall be deemed to have
> been made and the order deemed to have been filled on the date of
> delivery to the carrier or the Dealer, whichever occurs first. The
> Company has the right at any time and from time to time to change or
> eliminate prices, charges, discounts, allowances, rebates, refunds or
> other terms of sale affecting COMPANY PRODUCTS by issuing a
> new HEAVY DUTY TRUCK or PARTS AND ACCESSORIES
> TERMS OF SALE BULLETIN, new price schedules or other notices.
> In the event the Company shall increase the DEALER PRICE for any
> COMPANY PRODUCT, the Dealer shall have the right to cancel, by
> notice to the company within ten (10) days after receipt by the Dealer
> of notice of such increase, any orders for such product placed by the
> Dealer with the Company prior to receipt by the Dealer of notice of

_____

[3]In the Ford Truck Sales and Service Agreements, the term "HEAVY DUTY TRUCK" is replaced with the term "TRUCK." With an exception discussed below, the two contracts are materially identical in terms.

4

such increase and unfilled at the time of receipt by the Company of such notice of cancellation.

R11-13.  While this language is common to both the regular truck and heavy duty truck contract, paragraph 10 of the heavy duty truck contract contains additional language absent from the Ford Truck Sales and Service Agreement.

> The Company shall make available to the Dealer price schedules for HEAVY DUTY TRUCKS for distribution to Authorized Ford Truck dealers in the DEALER'S LOCALITY, or the Company may directly distribute such price schedules to such dealers. Such price schedules shall not make reference to HEAVY DUTY TRUCK deposits, allowances or other programs for which Authorized Ford Truck dealers are not eligible.

R12-14.  In the Heavy Duty Truck Sales and Service Agreement, this language is simply an additional paragraph inserted at the end of Paragraph 10.  The parties dispute whether Ford's Appeal-Level CPA program constitutes a proper means of establishing and publishing prices to its authorized dealers under the terms of the Sales and Service Agreement.

The allegations of breach of contract also extend to a separate provision of the Sales and Service Agreement, Paragraph 30, which governs notices.

> Any notice required or permitted by this agreement, or given in connection herewith, shall be in writing and shall be given by personal delivery or by first-class or certified or registered mail, postage prepaid.  Notices to the Company shall be delivered to or addressed to the District Sales Manager of the area in which the Dealer is located except notices given by the Dealer either to the

> Policy Board or pursuant to the Arbitration Plan. Notices to the
> Dealer shall be delivered to any person designated in paragraph F(ii)
> of this agreement or directed to the Dealer at the Dealer's principal
> place of business as described herein.

R12-30. The parties disagree as to whether Ford's use of facsimile to transmit price information in its Appeal-Level CPA program violates this provision of the contract, and further dispute whether the Dealers have waived this argument by their actions.

The contract disputes are not the only points of contention between Ford and the Dealers, as the parties also contest the propriety of Ford's representation by the law firm of Sutherland Asbill & Brennan LLP ("Sutherland"). Mr. Charles Ganz joined Sutherland in 1998 as a lateral partner. When Mr. Ganz moved to Sutherland, his retained clients, Peach State Ford and owner Tom Reynolds, became Sutherland clients. As counsel for Peach State and Mr. Reynolds, Mr. Ganz had maintained Peach State's corporate minutes, filed materials with regulatory agencies, and prepared trade name registrations. Mr. Ganz had also maintained Peach State's corporate minutes and served as its assistant secretary, a position which entailed updating corporate minutes and attesting to corporate documents. After joining Sutherland, Mr. Ganz and other firm lawyers aided Mr. Reynolds and his wife with estate matters.

6

Sutherland had a long-standing relationship with Ford predating Mr. Ganz' arrival at the firm, having represented Ford for more than thirty years. Accordingly, Sutherland represented Ford in the instant case, which was filed by the Dealers on July 1, 1999. Once the potential conflict of interest was discovered, Peach State and Reynolds refused to grant Sutherland's request to waive any conflict. Sutherland subsequently released Peach State and Reynolds as clients in November 1999. Peach State sought Sutherland's disqualification as Ford's local counsel, and the district court held a hearing on the motion on December 8, 1999. After the hearing, the district court published an order in which it held that Sutherland's dual representation of Peach State and Ford during the pendency of this action was undisputed. Nevertheless, citing Sutherland's prompt withdrawal from representation of Peach State and Reynolds as well as the fact that no confidential information about Peach State was communicated to Ford's litigation counsel, the district court denied the motion to disqualify Sutherland as defense counsel. As an alternative to disqualification, the court asked Sutherland to erect a "Chinese Wall" to prevent any communication of information regarding Peach State or Reynolds to those attorneys representing Ford in this litigation.

## I. Breach of Contract: Pricing System

At the heart of the Dealers' breach of contract claim is their allegation that Ford violated its contractual obligations to its dealers when it instituted its new pricing scheme. The Dealers contend that Ford had an obligation to sell its trucks at prices previously published to all authorized truck dealers. Ford's new pricing system, specifically the individualized Appeal-Level CPA program, allegedly violates this obligation. The Dealers also contend that faxing an individualized, transaction-specific price to one dealer, as is normal procedure during an Appeal-Level CPA negotiation, fails to meet Ford's obligation to sell its product at only pre-published prices.

When the language of a contract is clear and unambiguous, then the contract is not open to construction or interpretation and must simply be enforced as written. *Equitable Life Assurance Soc'y of the United States v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998); *Fragner v. American Community Mut. Ins. Co.*, 199 Mich. App. 537, 540 (1993).[4] If the contract terms are inconsistent on their face, or "are reasonably and fairly susceptible to multiple understandings and meanings," however, the contract is ambiguous. *Poe,* 143 F.3d at 1016; *Cincinnati Ins. Co. v. Federal Ins. Co.,* 166 F. Supp. 2d 1172, 1177 (E.D. Mich.

---

[4]The Sales and Service Agreements between Ford and the Dealers contain a Michigan choice-of-law provision. The district court found that this provision was enforceable and neither party disputes this finding on appeal.

2001).  The court must determine, as a matter of law, whether or not a contract is ambiguous.  *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58*, 517 F. Supp. 428, 432 (E.D. Mich. 1981).  Moreover, contracts should not be interpreted in a manner that renders any term or clause of that contract mere surplusage.  *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 702 F. Supp. 1317, 1325 (E.D. Mich. 1988); *Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106, 110 (1956) ("Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument.").  A simple disagreement between the parties as to the meaning of contractual terms, however, does not render a contract ambiguous.  *Poe,*143 F.3d at 1016.

Paragraph 10 governs prices and charges under the contract, and states that Ford will sell its products to the dealer in price schedules or notices published in accordance with the Heavy Duty Truck Terms of Sale Bulletin or Parts and Accessories Terms of Sale Bulletin.[5]  The contract further provides that Ford has the right to change its prices by issuing "a new HEAVY DUTY TRUCK or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price

[5]Again, the relevant terms in the truck and heavy duty truck contracts are identical.  For convenience, we will utilize the Heavy Duty Truck contract throughout this analysis.

schedules, or other notices." Ford contends that its Appeal-Level CPA program does not breach its contract with the Dealers because the contract language gives it the power to establish transaction-specific prices with each individual dealer. Ford seizes upon the singular "Dealer" in the contract language and contends that it is only obliged to publish its prices to the Dealer; accordingly, Ford is not obliged to sell its products only at prices previously distributed to all dealers. Further, Ford argues that when it faxes its decision on Appeal-Level CPA to an individual dealer, it is simply changing its price through issuance of a "notice" as provided for in the contract.

Even accepting Ford's posited interpretation as a reasonable interpretation of paragraph 10, however, we cannot construe the contract to support only Ford's interpretation to the exclusion of other interpretations. The Sales and Service Agreement requires prices to be set forth in schedules or notices in accordance with either the Heavy Duty Truck or Parts and Accessories Terms of Sale bulletins. Section 1(g) of the contract defines the Heavy Duty Truck Terms of Sale Bulletin as "the latest HEAVY DUTY TRUCK TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of HEAVY DUTY TRUCKS *to Authorized Ford Heavy Duty Truck*

10

*dealers*." R12-2 (emphasis added). Similarly, section 1(h) also describes the Parts and Accessories sales bulletin as a document setting forth terms of sale for all authorized dealers. *Id*. Thus, while each individual dealer contract may only impose obligations on Ford with respect to that dealer, the contractual language suggests that one of Ford's obligations to the individual dealer is to maintain and distribute bulletins which contain sale information pertinent to all dealers. The contract consistently couples the price schedules and notices with these dealer-wide bulletins and provides that price schedules and notices are to be published in accordance with these dealer-wide bulletins. Mindful of our obligation to consider every word and term in the agreement, we believe a reasonable interpretation of paragraph 10 would be to require Ford to publish its price schedules and other notices in accord with the truck and parts bulletins: containing sale information applicable to all dealers, and published to all dealers. Thus, we cannot conclude that the language of Paragraph 10 admits of no interpretation other than Ford's suggestion that the contract only requires it to deliver to each individual dealer the prices at which Ford will sell its products to that dealer. At the very least, the language of the contract is ambiguous as to whether price schedules and "other notices" published in accordance with dealer-wide bulletins could ever be in nature dealer-specific.

11

The additional language in the Heavy Duty Truck contract creates further ambiguity. The Heavy Duty Truck contract, unlike the Truck contract, imposes an additional obligation upon Ford to "make available to the Dealer price schedules for HEAVY DUTY TRUCKS for distribution to Authorized Ford Truck dealers in the DEALER'S LOCALITY, or the Company may directly distribute such price schedules to such dealers." This contractual language contemplates, at least with regard to Ford's heavy truck dealerships, that Ford would prepare and distribute pricing schedules that were applicable to all dealers in a given locality, not just the individual dealer named in the contract. From this provision, then, one reasonable interpretation of the contract would seem to require Ford to sell its products at prices applicable to all dealers in a given locality. Given that the preceding portion of paragraph 10, common to both truck and heavy truck Sales and Service Agreements, could be reasonably interpreted to require price schedules and notices to be published at a minimum locality-wide, we cannot find that the contractual language in the paragraph clearly and unambiguously allows of only one interpretation, one that allows Ford to publish notices of prices that are specific to that dealer and that dealer alone. Without such a finding, we cannot interpret contractual language as a matter of law. In light of our finding, we must reverse

12

the district court's award of summary judgment and remand this issue to that court for a trial on the merits, including a determination of the contract meaning.[6]

## II. Breach of Contract: Notice

In addition to the dispute over Paragraph 10 of the Sales and Service Agreement, the parties dispute whether Ford also breached Paragraph 30 of the Agreement, which requires Ford to send "[a]ny notice required or permitted by this agreement, or given in connection herewith . . . in writing and . . . by personal delivery or by first-class or certified or registered mail, postage prepaid."  R11-30. It is the Dealers' contention that in faxing its Appeal-Level CPA notices, Ford violated its contractual obligation to send such notices either by personal delivery or mail.  The district court, however, concluded that even if Ford were in breach of Paragraph 30, this breach was excused by the Dealers' waiver of any objection to this form of notice.

Under Michigan law, waiver of contractual rights can be shown "by proof of express language of agreement or ineffably established by such declaration, act, and conduct of the party against whom it is claimed as are inconsistent with a purpose to exact strict performance." *H.J. Tucker & Associates, Inc. v. Allied*

---

[6]At trial, we anticipate Ford may well raise the issue of waiver, which to this point has only been raised with regard to paragraph 30 of the Sales and Service Agreement, discussed *infra*.

*Chucker & Engineering Co.*, 234 Mich. App. 550, 564 (1999) (quoting *Fitzgerald v. Hubert Herman, Inc.*, 23 Mich. App. 716, 718-19 (1970)); *see also Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F. Supp. 2d 709, 718 (E.D. Mich. 1999). The record does not reveal any express manifestation of the Dealers' agreement to waive the notice requirement set forth in Paragraph 30. Nevertheless, an agreement to waive the personal or mail delivery requirement can be inferred from the Dealers' conduct as inconsistent with an intent to demand strict performance. It is undisputed that all Dealers participated in Appeal-Level CPA during the period at issue, and it is further undisputed that Ford always faxed its Appeal-Level CPA decisions to the requesting dealer. Thus, all Dealers would have received their Appeal-Level CPA notice by fax, and at that time would have had an opportunity to demand strict compliance with the requirements of Paragraph 30.[7] The Dealers do not contend that they ever protested Ford's decision to send

_____

[7]We recognize that the Dealers contend that this is an adhesion contract, wherein power imbalances rendered the Dealers unable to protest Ford's failure properly to deliver its notices to its authorized dealers. We have not found, however, that Michigan law treats the doctrine of waiver differently when contracts of adhesion are at issue. Further, given the facts before us, we cannot see how these franchise dealership contracts could be considered contracts of adhesion. A party seeking to set aside a contract as an adhesion contract must show that there were no real alternatives to the contractual provisions, considering such factors as relative bargaining power, economic strength, and any existing alternatives. *General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp. 2d 861, 871 (E.D. Mich. 2000). The facts do not suggest, however, that the Dealers lacked bargaining power or economic strength of their own. For example, there is no evidence that the Dealers would not have been able to secure dealerships from competitor truck manufacturers. *Cf. Beauchamp v. Great West Life Assurance Co.*, 918 F. Supp. 1091, 1098 (E.D. Mich. 1996) (dismissing employee's claim that contract was one of adhesion when

its Appeal-Level CPA notices by fax.[8]  Given that there is no dispute that the Dealers never insisted that Ford specifically perform the terms of Paragraph 30, we agree with the district court that the Dealers have waived any argument that Ford breached that provision of the contract.

### III.  Disqualification of Counsel

The Dealers also contend that the district court erred in denying their motion to disqualify Sutherland from representation of Ford due to a conflict of interest.  The Dealers contend that not only was there an actual conflict of interest, but also an appearance of impropriety from Sutherland's simultaneous representation of defendant Ford, plaintiff Peach State Ford, and Peach's owner, Tom Reynolds, while this case was pending in the district court.  The district court found that Sutherland had represented multiple clients simultaneously, suggesting disqualification might be proper under Disciplinary Rule 5-105 of the State Bar of

---

employee could have secured work with another employer and noting that "[u]nder plaintiff's theory, practically every condition of employment would be an 'adhesion contract' which could not be enforced because it would have been presented to the employee by the employer in a situation of unequal bargaining power on a 'take it or leave it' basis.").  Moreover, the Dealers had all incorporated their business under the laws of variously Delaware, Georgia, and Florida, which suggests some degree of business sophistication.  Further buttressing this conclusion are the Dealers' descriptions of themselves as very successful commercial enterprises with nationwide markets and customer bases.  R1-2, 1-3.

[8]Again, the Dealers contend that they were controlled by the unequal bargaining position in the dealership relationship, and that the reason that they failed to demand Ford's specific performance of the contractual terms creates an issue of fact.  As we have already discussed, however, we do not see how the facts support an inference that this was an adhesion contract.

Georgia,[9] but determined that Sutherland's prompt withdrawal from representation of Peach State and Reynolds, whom it had represented in unrelated matters, rendered disqualification improper.  We review the district court's findings of fact for clear error and carefully examine *de novo* the district court's application of ethical standards.  *Schlumberger Technologies, Inc. v. Wiley*, 113 F.3d 1553, 1558 (11th Cir. 1997); *Norton v. Tallahassee Memorial Hosp.*, 700 F.2d 617, 620 (11th Cir. 1983).

The Local Rules of the United States District Court for the Northern District of Georgia require attorneys appearing before it to comply with the court's specific rules of practice, the Code of Professional Responsibility and Standards of Conduct contained in the State Bar of Georgia's Rules and Regulations, and judicial decisions interpreting these rules and standards.  L.R. 83.1(C), N.D. Ga. Directory Rule 5-105(C) of the State Bar of Georgia provides that a lawyer may only represent multiple clients "if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent

---

[9]DR 5-105 is entitled "Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer."  This section was in effect at all relevant times in the instant claim, although Georgia has subsequently adopted new Rules of Professional Conduct.

professional judgment on behalf of each." Further, if a lawyer is required to decline representation under this provision, no partner or associate of that lawyer's firm can represent that client. DR 5-105(D). After the July 1, 1999 filing of the complaint, Sutherland was notified by Peach State and Reynolds of the existence of the conflict by letter dated October 13, 1999. It is undisputed that Peach State and Reynolds did not consent to multiple representation. Accordingly, the district court's findings of fact were not clearly erroneous, and it did not incorrectly apply the state ethics code in determining that DR 5-105's plain terms suggested that Sutherland be prohibited from representing Ford.

While the district court found Sutherland in violation of DR 5-105, the court found that it was bound by our holding in *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir. 1989), interpreting the propriety of disqualifying a law firm under DR 5-105(D). In *Tipton*, the plaintiff in an employment discrimination suit discovered that the defendant, her former employer, was being represented by the same law firm that represented the plaintiff in an unrelated property dispute. *Id*. at 1498. Upon discovery of the conflict, the law firm withdrew its representation of plaintiff Tipton in the property dispute but continued to serve as defense counsel in the employment discrimination claim. *Id*. The plaintiff alleged that the defendant's law firm must

17

be disqualified under DR 5-105(D) because the law firm had gained knowledge of the plaintiff's affairs through the attorney-client relationship. *Id*. at 1499. We determined, however, that the district court had properly denied the *Tipton* plaintiff's motion for disqualification, citing affidavit testimony provided by the property attorney that no material details of the representation were discussed with the employer's defense lawyers, and additional testimony that no confidential information about the plaintiff was ever shared with the attorneys representing the employer in the discrimination dispute. *Id*.

As in *Tipton*, Mr. Ganz, who represented Peach State and Reynolds in corporate and estate matters, testified that he did not share information about his clients with those attorneys who handled Ford's defense, and certainly not confidential information.[10] Thus, after carefully reviewing the district court's

---

[10]The Dealers argue that Sutherland's continued representation of Ford also created the appearance of impropriety, a situation which justified disqualification. While it is true that proof of actual impropriety is not demanded before disqualifying counsel under this theory, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir. 1976) (discussing appearance of impropriety as set forth in Canon 9 of the Code of Professional Responsibility); *see also Waters v. Kemp*, 845 F.2d 260, 266 n.13 (11th Cir. 1988) (noting the Code's replacement by the Model Rules of Professional Conduct but reiterating the *Woods* test for finding appearance of impropriety). The Dealers have not alleged a reasonable probability that any identifiable impropriety may have occurred; on the contrary, the Dealers state that "[w]e will never know whether or how Ford benefitted and Peach State suffered as a result of Sutherland, Asbill continuing as Ford's counsel against its client Peach State." Appellants' Brief, at 14. Further, while the Dealers argue that Sutherland was in possession of information about Peach State's ownership, operation of dealership, tax matters, and the Reynolds' estate planning matters, the Dealers only posit that this information was worthwhile as impinging on matters of

18

application of law to the facts of this case, we cannot say that the district court clearly erred in its findings of fact or improperly applied ethical standards in denying the motion for disqualification.

For the reasons stated above, we find that the district court improperly granted summary judgment to Ford on the breach of contract claim and remand to the district court for further proceedings in conformity with our opinion. We nevertheless affirm the district court's findings that the Dealers have waived any argument that Ford breached paragraph 30 of the franchise contract and its order denying the motion to disqualify Sutherland as defense counsel.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

credibility. The dealers do not appear to allege that any information in Mr. Ganz' possession would have given Sutherland insight into the breach of contract claim. Further, corporate and estate matters are not the same subject matter as breach of contract. *Cf. Crawford W. Long Memorial Hosp. of Emory University v. Yerby*, 258 Ga. 720 (1988) (finding motion to dismiss for appearance of impartiality should have been granted where attorney sought to bring tort claim against very hospital he had previously defended against the same claim, and representation grew out of an event which occurred during time of representation of former client).